[No. G021145. Fourth Dist., Div. Three. Mar. 5, 1999.]

MARSHALL R. ABBOTT, Plaintiff and Respondent, v.
SERGIO MANDIOLA, Defendant and Appellant.

**COUNSEL**

Baker, Silberberg & Keener, Marshall Silberberg, Mark V. Franzen; Thelen, Reid & Priest, Thelen, Marrin, Johnson & Bridges, Curtis A. Cole, William F. Holbrook and Matthew S. Levinson for Defendant and Appellant.

Hurst & Hurst, Debra L. Hurst; and Susan W. Garrett for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.**—Sometimes, because of congested court dockets and scheduling difficulties, the "direct calendar" judge who is assigned a case for all purposes is not the judge who conducts the trial. Such a reassignment can lead, as happened in the present case, to trouble. Certain pairs of proceedings *must* be heard by the same judge if he or she is able to do so: for example,

trials and new trial motions. (See Code Civ. Proc., § 661.) The judge who presided at trial is obviously the best qualified to determine the validity of the new trial motion and it makes no sense to have another judge hear it. The same goes for the pair of proceedings in the case before us now: a mistrial and a request for sanctions brought against a litigant for causing that mistrial. As a matter of commonsense judicial administration and Supreme Court precedent governing the analogous area of new trial motions, we hold that, absent inability, the judge who declares a mistrial must also hear any request for sanctions against anyone causing that mistrial.

In this case, a different judge from the one who declared the mistrial considered a sanction motion based on the mistrial, which allegedly resulted from a discrepancy between a litigant's deposition testimony and his trial testimony. The nontrial judge assessed sanctions in excess of $43,000 on the premise that the litigant was a liar. We reverse the order. It was the trial judge, otherwise available to hear the sanction request, who was in the best position to determine the credibility, true nature, and motive behind the discrepancy between the trial and deposition testimony. We remand the matter for the trial judge to determine the sanctions motion.

### Background Facts and Case History

Marshall R. Abbott underwent hernia surgery by the defendant doctor, Sergio Mandiola. Hernia surgeries are known in the medical world as "herniorrhaphies." A hernia surgery using fiber optic technology and small incisions is known as a "laparoscopic herniorrhaphy." We shall refer to them as "fiberoptically-aided" hernia operations.

There has been a four-stage evolution in fiberoptically-aided hernia operations. Initially, small gauze patches were rolled into cylinders and used as plugs to fill the space created by the muscle tear. In the second stage, surgeons began to place a piece of gauze mesh loosely above the plugs. In the third stage, surgical staples were used to anchor the gauze mesh placed above the plugs.

Finally, Dr. Edward Felix pioneered the fourth stage. He developed a "technique" which dispensed with rolled cylinders altogether. Rather, *two* pieces of gauze were anchored with staples. Dr. Felix's technique is thus called a "double mesh" procedure.

Abbott experienced considerable pain following a "double mesh" fiberoptically-aided hernia operation in June 1992. He sued Dr. Mandiola for medical malpractice in September 1993. The case was assigned to Judge H. Warren Siegel.

At the doctor's deposition he had testified to two things of particular importance to Abbott's case: One, it had been his custom to use the double mesh procedure on "all" fiberoptically-aided hernia operations *after* he went to see Dr. Felix. Two, Abbott was either the first or second patient on which he had done a double mesh operation.[1] Based on the latter statement, Abbott contended he should have been *told* about the doctor's relative inexperience with double mesh operations.

After his deposition but while he still had time to correct the transcript, Dr. Mandiola obtained a simple list from Western Medical Center in Santa Ana of all his fiberoptically-aided hernia operations (not necessarily just those using the double mesh technique) in the years 1991 and 1992. The list would eventually become "Exhibit H" at trial.

The list did not show the *kind* of fiberoptically-aided hernia operation which Dr. Mandiola had performed (i.e., did not show whether an operation on a specific day involved old-fashioned first-stage rolled cylinders or fourth-stage double meshes). It did, however, show that Dr. Mandiola had performed nine such operations, and that Abbott's operation was the *ninth*. It also showed that he had performed *four* operations between March 26, 1992, the date Dr. Mandiola was trained in the double mesh procedure by Dr. Felix, and Abbott's operation.

Dr. Mandiola did not correct his deposition testimony, either to say that *not all* his post-Dr. Felix operations were double meshes, or that Abbott's operation was the fifth—not the first or second—double mesh operation.

The case came to trial in March 1996 and was reassigned to Judge Jack K. Mandel.[2] Relying on the list, Dr. Mandiola testified on direct examination

---

[1]Here is the relevant testimony:

"Q. Was it your custom and practice, in 1992, to use two meshes on all laparoscopic hernia repairs?

"A. I started to do this procedure after I went to see Dr. Felix.

" . . . . . . . . . . . . . . . . . . . . . .

"Q. On how many patients—was Marshall Abbott the first patient you used two meshes on?

"A. It might have been the first or the second. I don't remember whether it was the first or second . . . ."

[2]The case had come to trial once before in November 1995 in front of Judge Siegel, but a mistrial was declared before voir dire was completed when the defendant's counsel had a family emergency. This "first" trial is completely irrelevant to the issues in this appeal except to the extent that it may illustrate that trial court scheduling difficulties may be one of the reasons that cases ostensibly assigned to one judge end up getting tried by another.

that he had done *four* double mesh operations before he did Abbott's operation.[3]

The change from the deposition testimony immediately elicited considerable consternation on the part of Abbott's counsel, who, as noted above, had built her case around the proposition that Dr. Mandiola had done only one or two such operations, as he had stated in his uncorrected deposition. The new information, according to counsel, "totally" changed the "complexion" of her experts' testimony, her "trial preparation" and her ability to cross-examine on the issue. She proposed that the jury be told to disregard the doctor's testimony and have the court force him to "stand by his earlier testimony." For his part Dr. Mandiola's attorney argued that the number of prior double mesh operations performed by his client didn't make any difference as to whether there was any actual malpractice in the one performed on Abbott.

Judge Mandel rejected telling the jury to disregard the doctor's trial testimony and decided to declare a mistrial: "Well, I've heard enough at this point. The plaintiff considers this critical; the defense doesn't consider it critical. I do not think I can erase this from the jurors' minds. With a million dollars involved, I cannot exclude the defense from going into this response. I'm not going to put anybody with a leg up. [¶] It behooves me at this time to mistry the case. For a million dollars you should get due process of law, and I don't think it can be guaranteed at this point in light of this conflict. So that's what I'm going to do."

*Seven months later*, in October 1996, Abbott's counsel filed a motion for sanctions pursuant to section 128.5 of the Code of Civil Procedure[4] seeking all attorney fees and costs associated with the mistrial. Prior to the hearing Judge Mandel "sent" the case back to Judge Siegel, who heard the motion.

Dr. Mandiola opposed the motion on a number of grounds, including that a mistrial was inevitable because Judge Mandel had been predisposed to grant a mistrial if the trial exceeded an initial eight-day time estimate.[5]

At the hearing on the motion, Judge Siegel told Dr. Mandiola's counsel: "You got a basic problem here, don't you think so, counsel? Your client is

---

[3]As it turned out, the truth was that *not all* of Dr. Mandiola's post-March 26, 1992, fiberoptically-aided hernia operations involved the double mesh technique. In fact, after the mistrial records for each patient otherwise anonymously on the list showed that *none* of the four operations prior to Abbott's but after the training by Dr. Felix involved the double mesh technique.

[4]All further references to section 128.5 are to the Code of Civil Procedure.

[5]As this appeal is now postured, the problem of when a mistrial should be declared if a case exceeds its time estimate is not before us. Even so, we must observe: Haste makes waste. Obviously trial court administration scheduling requires a reasonable approximation between

an established liar. He ought to be punished for fabricating all this." And so the motion was granted, and an award made of $43,204, albeit against Dr. Mandiola only. He now appeals from the sanction order.

### *Sanctions for Misconduct Causing a Mistrial Must Normally Be Heard by the Judge Who Ordered the Mistrial*

Direct calendaring entails assignment of a case to one judge for all purposes, including trial. (See *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 487, fn. 6 [274 Cal.Rptr. 911] ["assignment of cases to one judge for all purposes"]; cf. *Mackey* v. *Superior Court* (1990) 221 Cal.App.3d 1124, 1126 [270 Cal.Rptr. 905] [" . . . under a direct calendaring system whereby the judge normally assigned to that department would, barring unforeseen circumstances, preside over all matters in the case, including trial"].) One of the chief advantages of a direct calendaring assignment is the increase in the trial court's ability to police mischief committed by counsel or litigants. (See *Bidna* v. *Rosen* (1993) 19 Cal.App.4th 27, 38-39 [23 Cal.Rptr.2d 251] [recommending single-judge assignments in family law to prevent succession of meritless hearings designed to wear down opponent].)

Such an advantage in the context of trials and new trial motions was recognized by the Legislature as early as 1929. Section 661 of the Code of Civil Procedure *requires* motions for new trial to be heard by the same judge who presided over the trial.[6]

In affirming a judgment fining three attorneys who brought a new trial motion to a different judge than the one who presided over the trial, our Supreme Court gave a hearty stamp of approval to the commonsense principle animating section 661: "[W]e think that the very essence of this enactment is that the motion for the new trial shall be heard and determined whenever practicable by the judge who had heard the evidence at the trial of the case, and who was therefore *best prepared and qualified to pass upon the merits of the motion.* As we have seen, *prior to the adoption of this section of*

---

counsel's estimated time for trial and actual time. But adherence to a rigid get-it-over-within-your-original-time-estimate approach falls into the opposite ditch, and can waste a great deal of court and attorney time in any given case. Moreover, to the degree such a policy is justified by the in terrorem effect on attorneys to stay within original time estimates, it will only encourage longer time estimates as attorneys give themselves a greater margin for error. In addition it will encourage stalling at trial by any party who believes it can obtain an advantage by crowding the time available to its opponent. A trial, unlike grand master chess or the last two minutes of a close football game, should not become a race against the clock.

[6]Section 661 provides in pertinent part, "The motion for a new trial shall be heard and determined by the judge who presided at the trial . . . ." The statute goes on to provide an exception if the trial judge is unable to hear the motion or out of the county.

*the code in its present form, such a motion could be made before any judge of the court in which the action was pending. Such a procedure no doubt often produced confusion or resulted in a failure of justice in many instances.* For it needs no argument, we think, to prove that a judge who has heard the evidence, examined the witnesses, and made a study of the law applicable to the facts in a case is best qualified to rule upon the weight and value of the testimony of such witnesses, as well as upon other questions presented by the motion and which were involved in the trial of the action and to which the trial judge in most instances has given his attention and studious consideration. To have the motion for a new trial heard by a judge familiar with the facts and law of the case, rather than by one totally unfamiliar with such facts and who has made no special study of the law applicable to those facts, was the very essence of section 661 of the Code of Civil Procedure." (*Francis* v. *Superior Court* (1935) 3 Cal.2d 19, 28-29 [43 P.2d 300], italics added.)

The situation before us is analogous and the *Francis* principle appropriate for extension to mistrials as a matter of the common law governing the subject of mistrials (cf. Code Civ. Proc., § 616) and explicating section 128.5. While no specific statute absolutely requires that sanctions for a mistrial based on alleged litigant misconduct be heard by the trial judge, the policy behind section 661 and the principles of sound judicial administration as articulated in *Francis* dictate that the rule be the same.

■ A mistrial may be declared when an error "too serious to be corrected" has occurred. (See generally, 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 181, p. 207.) Such an error can be based on a litigant's misconduct. (*Ibid.*) ■ If sanctions are to be imposed, the judge who made the determination that the misconduct could not be corrected is obviously in the best position to assess them. Only he or she will be able to gauge precisely why the misconduct could not be cured short of a mistrial. Indeed, only he or she will be privy to the full weighing that went on before the mistrial was declared.

This case illustrates particularly well why the trial judge is, as the *Francis* court put it, the "best qualified" to rule on the merits of a motion seeking sanctions for a mistrial caused by litigant misconduct. Judge Siegel's remarks are very clear. He believed that Dr. Mandiola wasn't just mistaken in his testimony, or under some misimpression and vulnerable to having his credibility attacked. The doctor wasn't confused. He was lying. That is the ineluctable import of Judge Siegel's comments and the reason Judge Siegel believed that Dr. Mandiola should be sanctioned.

The case reports are full of statements that appellate courts are not triers of fact. Typically, an appellate court has only a cold transcript, exhibits, and

papers from the trial court's file to go on. Even when a videotape is available we cannot experience what the trial judge experienced—the nuances, the inflections, the body language which traditionally form part of the basis on which credibility is evaluated by triers of fact. Despite technology, credibility determinations require a personal presence that a cold transcript cannot convey. (Cf. *Guardianship of Sullivan* (1904) 143 Cal. 462, 467 [77 P. 153] [litigant cannot be compelled to accept a decision on the facts from judge or jury who did not hear the evidence].) As the Norma Desmond character stated in the musical *Sunset Boulevard*: "Watch me when I frown, you can't write that down."

Judge Siegel, like an appellate court, was not present when Dr. Mandiola testified in alleged contradiction to his deposition. He did not have access to the body language or vocal indicia which might have revealed to Judge Mandel whether the doctor was lying, or simply confused, or under some semantic misimpression. Yet in ruling on the sanction motion, Judge Siegel unhesitatingly determined that the discrepancy in Dr. Mandiola's testimony was not the product of a good faith mix-up, but a deliberate bad faith ploy. Essentially, he made, in the language of the *Francis* court, an evaluation of the "weight and value" of Dr. Mandiola's testimony *in the trial* in a context where the trial judge was clearly the best qualified.

By contrast, only Judge Mandel was in a position to truly assess whether Dr. Mandiola was either (a) a bald-faced liar oblivious to the consequences to his adversary of a straight-out lie that he had done four double mesh operations instead of one or two, (b) an innocent litigant with a hazy memory, or (c) something in between. Moreover, only Judge Mandel could fully appreciate all the balancing that went into the decision to declare a mistrial rather than instruct the jury to disregard Dr. Mandiola's testimony or simply allow Abbott's attorney to exploit the discrepancy and presumably show that Dr. Mandiola was not a credible witness.

Accordingly, it was error for Judge Siegel to hear the motion. Knowing that Judge Mandel had declared the mistrial, he should have referred the motion to Judge Mandel for adjudication. The request for sanctions should have been heard by Judge Mandel, and we expect that on remand it will be.[7] We recognize, of course, that any judge who must conduct a hearing after a

---

[7]The logic of reversing the order because the wrong judge heard it cuts both ways. Judge Siegel denied Abbott's request for sanctions against Dr. Mandiola's trial counsel though not Dr. Mandiola himself. As we have indicated, only Judge Mandel should have made that call. However, Abbott has taken no separate cross-appeal from the order denying sanctions as to Dr. Mandiola's trial counsel, and, since we are not reviewing the order exonerating counsel on the merits, there is nothing we can do about it, even though in his respondent's brief Abbott asks that this court reverse the order denying sanctions against counsel. A

significant delay—here, even the seven months between the mistrial and sanction motion (and that doesn't even count the the pendency of the appeal)—is under a significant handicap.[8] Still, there is no alternative. Despite the delay, Judge Mandel remains the best qualified person to hear the motion.

### Other Issues and Disposition

In light of our determination that the case must go back to Judge Mandel, it is unnecessary to consider any of the remaining issues.[9] The sanction order is reversed and the matter remanded to the trial court with directions that the sanction motion be heard by Judge Jack K. Mandel.

Crosby, J., and Wallin, J.,* concurred.

---

respondent's brief is not the place to ask for reversal of a court order. The order denying the motion as to counsel must therefore stand as final.

[8]At oral argument we inquired about the seven-month delay and were told that it was because the parties had engaged in settlement discussions during that period. Whether that is a sufficient excuse under the circumstances of this case and in light of the practical realities of busy calendars faced by many trial judges is a matter which Judge Mandel can consider on remand.

[9]The record hardly *compels* a finding of bad faith tactics; it would seem *to us* that the more reasonable explanation is that Dr. Mandiola was simply confused. Also, as we have indicated above, there is a significant issue inherent in the seven-month delay between the mistrial and the sanction request. Even so, it is still Judge Mandel, not the members of this panel, who must make the factual determinations necessary to an adjudication of the sanction request.

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.