[No. G036590. Fourth Dist., Div. Three. Mar. 10, 2006.]

DEBORAH BRELANT BLUMENTHAL, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
EDWARD BLUMENTHAL, Real Party in Interest.

COUNSEL

Dell'Ario & LeBoeuf, A. Charles Dell'Ario, Jacques LeBoeuf; Langston Williams Professional Corporation and Joanne Langston for Petitioner.

No appearance for Respondent.

Law Offices of Patricia J. Grace and Patricia J. Grace for Real Party in Interest.

OPINION

**SILLS, P. J.—**

## I. SUMMARY

In this writ proceeding we hold that the trial judge abused her discretion in declaring a mistrial in a family law case merely because the parties did not complete the long-cause trial of a dissolution prior to an arbitrary deadline set by the trial judge. (The actual trial, in fact, had consumed less than two court days, and there was only one witness left to call and only a few more hours left to go.)[1]

We also hold, since trial was already in progress, that it was "possible" within the meaning of Family Code section 2330.3 for the trial judge, assigned at the time of the trial to a "family law" panel, to have taken the case with her to her subsequent courtroom assignment, and in fact she should have taken it. (As it turned out, her new assignment is literally one courtroom away in the same courthouse and is still denominated a "family law" assignment.) We will therefore grant the petition brought by the wife for a writ of mandate ordering the trial court to vacate the mistrial and set the matter for completion of the trial before this same trial judge.

## II. FACTS

Until the beginning of trial in October 2005 the case had proceeded at what can only be described as a leisurely trot. The petition for dissolution was filed more than five years ago, and in the previous century (September 1999). The record in this writ proceeding shows that Judge Nancy A. Pollard was assigned to the case no later than April 2002. The case was considered a "long cause" matter. While the status of marriage was officially dissolved in

---

[1] The mistrial was declared about 3:00 p.m. on a Friday afternoon.

September 2001, trial of the reserved issues (the hard part of the case) went through a series of continuances: from September 2002 to November 2002 to August 2003 to January 2004 to April 2004 to August 2004 to January 2005 to May 2005[2] to October 2005 when it finally got going. The court, however, did not begin to take any *testimony* until October 31, 2005.

The record in this writ proceeding does not reveal why the trial judge granted most of these continuances. It is clear, though, that Judge Pollard continued to preside over the case during the period, and, on the record before us, we presume there was good cause for each continuance. (See Civ. Code, § 3548 [presumption that "The law has been obeyed"].) In any event, at the end of the first day of trial testimony on October 31, the trial judge told the parties that the next date available to hear their case would be November 18. She ordered the parties back, but also stated: "We will finish. I want everybody to think about what their most important questions are because the very last important question is going to be asked and answered at three o'clock."

So that readers can have a better sense of exactly what happened, we will now detail the proceedings of the afternoon of November 18 as they led to the mistrial.

The afternoon session that Friday began with the redirect examination of an expert for the husband (as the nominal "respondent" in the litigation, having put on his case-in-chief last) by the husband's counsel. Then came recross examination of the expert by the wife's counsel, and further redirect from the husband's counsel.

The examination of the expert finished before three o'clock. Wife's counsel asked if she could call her own expert for "one quick question on his bill so we have that in evidence and [then] he [could] leave." Husband's counsel then added that she might "have a couple a questions" for that expert too. But then husband's counsel told the court that she didn't want the wife's expert "calling him back again to ask him one or two more questions when we get to [husband's] case by asking whatever questions we have now."

At that moment, apparently about 2:50 p.m. in the afternoon, the trial judge interjected: "I'm concerned that this case has gone way beyond the time allotted, way beyond. We're going to finish at three o'clock or I'm going to mistry this case."

---

[2] By this time Judge Pollard was evidencing some (very understandable) displeasure with the pace of proceedings. When the January trial date was continued to May, she noted: "This case has gone on for quite a long time. And it's been almost a year since we've been mucking about without any activity when we're in the middle of some hearings. [¶] So very reluctantly I granted a continuance upon the representation of [counsel for the husband] that under no circumstances was her previously retained accountant available and that it would be a great disservice not to have an accountant available for the hearing."

Husband's counsel protested. She had more evidence: "Your honor, my client needs an opportunity to testify and has not been provided with an opportunity to provide his testimony and that isn't going to happen in 10 minutes." And after the judge said, "all right," husband's counsel added, "It's going to take probably several hours."

The court was firm: "Well, then, this case is going to be mistried."

Wife's counsel then offered to simply have the evidence of her expert's bill made a matter of stipulation based on his written statement.

Husband's counsel, however, felt that her client was being prejudiced in the total time allocation: "Not that I'm looking certainly for a mistrial—I don't see how that is going to cure the fact that petitioner [wife] has been given a fair amount of time to try this case, and so far we've been given some time, but not as much time, and my client doesn't get to testify? He needs to testify and put on his part of the case."

The judge immediately returned to the theme that the whole case had simply been going on too long. "Counsel, how long have we been going on this case?"

Wife's counsel replied in one word. "Forever."

The judge responded: "Forever. And I cannot see that it's going [to] get finished today."

Wife's counsel quickly made the point that it would be real disservice to her client if the case were mistried, and argued that the delays were due to the husband's "antics." She argued in that regard that the husband had tried to delay the case "again this morning by bringing in another new report that I have never seen. If we mistry this thing, this is exactly what he wants" since that would leave the wife "depleted."

The court then inquired about the existence of a support order. There was one—$2,500 a month, $625 being spousal—and the husband's counsel quickly protested that "there is certainly blame to go around on the [wife's] side . . . . It's not fair to point fingers."

The trial judge immediately shifted the focus of the discussion to her own calendar: "Ms. Grace, Ms. Langston, let me tell you both[3] this court is

---

[3] The reporter's transcript has the judge saying "let me both tell" which is more likely a transposition error by the reporter than the trial judge being tongue-tied.

leaving department L64 at the end of the year. There is not another day this year that this case can be heard. I was supposed to go to a seminar today. I cancelled my appearance at that seminar so we can get this case finished. We have not gotten it finished. We have spent more time on $101,165 than is worth $101,165. [¶] All I can say to you is it's not going to get finished. I'm not taking it to department L63 for my domestic violence calendar. I have no other choice. I have no other choice."

After ascertaining that husband's counsel still had a couple of hours still to go [after all, husband had yet to testify], the judge reiterated the facts that there wasn't enough time—"I don't have a couple of hours this year . . . ." and she had given up a seminar to do the case that day. The judge finished by expressing the thought that perhaps a stipulation might have avoided the time crunch. "Why there could not have been a stipulation, I don't have the foggiest, but what I am saying to you is it is not going to get finished. We can't get there. There isn't enough time. Period. I have no other alternative."

In desperation, wife's counsel offered to submit the case then and there, to which the husband's counsel retorted that it would be "grossly unfair" to do that, given that the "majority" of the time had been consumed with the wife's case.

The trial judge (apparently speaking to the husband's counsel, though perhaps to both) then pointed out that she had been liberal with the "inordinate amount of objections and I let you go with your objections," but came back to the determination to end at three o'clock: "I am telling you, there is no—there is not two to three hours left. We have seven minutes. That is it. That is it. . . . [¶] So I have to declare a mistrial."

Wife's counsel again protested that husband's counsel had taken an inordinate amount of time to cross-examine her expert and her client and reiterated her theme that husband really wanted the case "delayed so he can start all over in front of a new judicial officer and get a second bite out of the apple."

At this point the discussion turned to the degree that each side's experts might have cooperated with each other, but after husband's counsel finished by returning to her theme that it was unfair to give the wife more total time, the court ended the discussion with "The court has mistried this case. That is the court's ruling. There is no time to finish."

Wife's counsel then brought this writ proceeding seeking an order commanding the trial court to vacate the mistrial and set the matter for further proceedings to conclude the trial.

This court invited the husband, real party in interest, to informally respond. While husband objected to the characterization made in the petition that he had caused or contributed to the mistrial, the husband did not oppose the wife's essential relief of having the mistrial vacated and the case returned to Judge Pollard to conclude the trial.

## III. DISCUSSION

### A. The Standard of Review

This is one of those cases where an extended analysis of exactly which standard of review applies is warranted.

There is no specific statute governing mistrials in the Code of Civil Procedure, though that code certainly recognizes that there will be mistrials, and the code thus makes rules to take them into account. (E.g., Code Civ. Proc., § 583.320, subd. (a)(1) [time requirement to bring case to trial again after mistrial]; § 616 [allowing cases where for some reason jury has been prevented from giving a verdict to be "again tried immediately"]; § 1263.150 [defining presumptive date of valuation in eminent domain proceedings when there has been an earlier mistrial].) The matter is thus essentially one of common law.

■ The fundamental idea of a mistrial is that some *error* has occurred which is too serious to be corrected, and therefore the trial must be terminated, so that proceedings can begin again. (See 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 181, p. 207 ["A mistrial is the termination of a trial prior to completion, on order of the judge, for error too serious to be corrected."]; Code Civ. Proc., § 616 [provision for trial to begin immediately again where jury has been prevented from rendering verdict].)

Because the core idea of a mistrial is the presence of error that cannot be corrected, it is natural that, generally speaking, the standard of review will be abuse of discretion. That is, the trial judge, present on the scene, is obviously the best judge of whether any error was so *prejudicial to one of the parties* as to warrant scrapping proceedings up to that point. "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776], citing *Illinois v. Somerville* (1973) 410 U.S. 458, 461–462 [35 L.Ed.2d 425, 93 S.Ct. 1066].)

Despite the discretionary nature of the decision to declare a mistrial, one can detect in our Supreme Court's jurisprudence a substantive preference

against them. That is, the high court has narrowly defined the grounds for *grants* of mistrials, but has emphasized the deferential abuse of discretion standard in ruling on *denials* of motions for mistrial: "A trial court should *grant* a mistrial *only* when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling *denying* a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555 [127 Cal.Rptr.2d 802, 58 P.3d 931], italics added, citing *People v. Ayala* (2000) 23 Cal.4th 225, 282 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Silva* (2001) 25 Cal.4th 345, 372 [106 Cal.Rptr.2d 93, 21 P.3d 769] [same words as *Bolden*].)[4] After all, a mistrial by definition is a species of prophylactic waste of resources in the name of preventing yet further waste of resources. The decision to declare a mistrial is one that essentially scraps a considerable public investment in the form of judge (and maybe juror) time, and an equivalent private investment in the form of attorney and witness time.[5] The waste is justified in the name of a higher good, namely, the prevention of the further waste of resources at the appellate level where, presumably, the error would be corrected by vacating the judgment and sending the case back for retrial anyway.

The word "only," and the phrase "chances of receiving a fair trial . . . irreparably damaged" in the Supreme Court's formulation express a presumptive (and commonsense) reluctance to allow the waste of resources that mistrials entail—a level of scrutiny perhaps a little higher than the most permissive in the law.[6] An analogy might be drawn, in this regard, to the standard of review on trial court decisions to set aside defaults. Both grants of set aside motions and denials are still tested under the abuse of discretion standard, but the cases have evolved a somewhat stricter standard for review of denials of set aside motions than grants of them. (See *Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233 [211 Cal.Rptr. 416, 695 P.2d 713] ["a trial order denying relief is scrutinized more carefully than an order permitting trial on the merits"]; *Brill v. Fox* (1931) 211 Cal. 739, 743–744 [297 P. 25] ["Although it is true that courts of appeal have shown great reluctance in cases of this kind to disturb the order of the trial court, it is equally true that denials

---

[4] It must be recognized, though, that a grant of a mistrial in the criminal context may have public consequences beyond just the waste of everybody's time. Depending on the circumstances (and we do not in this opinion express any comment on those circumstances), a criminal may go free because of the constitutional protections against double jeopardy. (Cf. *People v. Batts* (2003) 30 Cal.4th 660, 696 [134 Cal.Rptr.2d 67, 68 P.3d 357] [giving reasons double jeopardy clause was not violated].)

[5] Arguably, a little of that time might be recovered the second time around since the parties will be in a better position to conduct their cases more efficiently, but even that might be offset by the need of the judge and the attorneys to refresh themselves about the case before the rerun.

[6] We of course express no opinion in this civil case about the whole issue of "legal necessity" as it relates to double jeopardy in the criminal law.

of such relief by the trial court are scanned more carefully than cases where the trial court has granted the relief, to the end that wherever possible cases may be heard on their merits."]; *Rogalski v. Nabers Cadillac* (1992) 11 Cal.App.4th 816, 820 [14 Cal.Rptr.2d 286] [" 'We will more carefully scrutinize an order denying relief than one which permits a trial on the merits.' "]; *Mink v. Superior Court* (1992) 2 Cal.App.4th 1338, 1343 [4 Cal.Rptr.2d 195] [source of quotation in *Rogalski*].)

The case before us is unusual in that the reason for the mistrial had nothing to do with prejudice to a party. What is clear from the record of proceedings on November 18 is that husband's counsel didn't move for, ask for, or otherwise expressly desire a mistrial. Husband's counsel merely wanted to complete her client's case by calling her client.[7] *The matter thus comes to us in the posture of the trial judge declaring a mistrial over the wishes of both parties.* The mistrial was declared for reasons peculiar to the trial judge's own calendar.

In that regard, we examine the substantive law on that point for further clues as to the appropriate standard of review. There are three such clues, and they all point in the same direction.

■ First, as a matter of the formal standards of judicial administration, there is a rule that every judge shall hear all matters to which he or she is assigned. (Cal. Stds. Jud. Admin., Std. 6.608 ["Each judge must: [h]ear all assigned matters unless he or she is disqualified . . . ."].)

Second, the administrative rule requiring each judge to hear all assigned matters is, if anything, heightened in family law cases. As regards family law assignments, the Legislature has specifically declared that: "All dissolution actions, *to the greatest extent possible*, shall be assigned to the same superior court department for all purposes, in order that all decisions in a case through final judgment shall be made by the same judicial officer." (Fam. Code, § 2330.3, subd. (a), italics added.) While the "possible" within the "greatest extent possible" formulation certainly indicates that abuse of discretion is the standard, at the same time the words "greatest extent possible" suggest a bona fide effort to have the same judge hear all decisions through final judgment. "Possibility" is not some cloak of invisibility that fits any size.

---

[7] In this opinion we scrupulously avoid any comment on an issue on which wife and husband disagree—namely whether husband has some ulterior motive to "deplete" wife's resources by dragging the case out just long enough to provoke a mistrial, which would send trial back to square one. Perhaps. Perhaps not. The record, however, only shows that the husband's counsel desired a few more hours to complete the case and made no effort to encourage the trial court to grant the mistrial.

Third, if the law is, at least, a little more skeptical than usual about grants of mistrials than denials of them, it must surely must be no less skeptical about grants of mistrials for the convenience of the trial court's calendar. That is the implication of the one-judge-must-hear-the entire-case rule of *European Beverage, Inc. v. Superior Court* (1996) 43 Cal.App.4th 1211 [51 Cal.Rptr.2d 147]. *European Beverage* was an ordinary civil case involving the ownership of a corporation, where the trial was bifurcated so that equitable issues of accounting and constructive trust were tried in phase one of the trial, to the court. But after phase one of the trial was completed and before phase two, involving various tort claims, could begin, the judge was transferred to a master calendar department, (apparently) starting January 1. The judge thus announced in mid-December that he was no longer available to try the case, and the remaining issues would be transferred to another judge. One party then sought a writ of mandate asking that either the transfer to the new judge be quashed, or that a mistrial be declared. The appellate court granted the writ, reasoning that the party had a common law right to a decision from *a judge who had heard all the evidence,* not just a portion of it. (See *European Beverage, Inc. v. Superior Court, supra,* 43 Cal.App.4th at pp. 1213–1215; e.g., *Guardianship of Sullivan* (1904) 143 Cal. 462, 467 [77 P. 153] ["A party litigant is entitled to a decision upon the facts of his case from the judge who hears the evidence . . . . He cannot be compelled to accept a decision upon the facts from another judge . . . ."].) This common law right is ultimately grounded in the common sense idea that it is " 'a denial of due process for a new judge to render a decision without having heard all of the evidence.' " (*In re Marriage of Colombo* (1987) 197 Cal.App.3d 572, 581 [242 Cal.Rptr. 100], quoting 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 45, p. 483.)

Now, it is true that, given the nature of the petition for writ in *European Beverage,* the appellate court gave the trial court the *choice* of vacating the transfer of the case to the new judge or declaring a mistrial. (*European Beverage, Inc. v. Superior Court, supra,* 43 Cal.App.4th at p. 1216.) That is, neither party was so concerned with its investment so far into the case that it argued strongly in favor of keeping the one trial judge on the case. The main fear was that another trial judge who had not heard *all* the case would be rendering the ultimate judgment. That said, the requirement of having one judge hear all the case has its implications for judicial administration. Once trial has begun, it *is* a waste of resources to step off the case, and it is clear from *European Beverage* that the trial judge's new assignment—there, an administrative one at that—was not postulated to be a compelling reason to have a new judge begin all over again. The same may be said here, except that the interest in prevention of waste is stronger.

■ In harmony with the formulations by the Supreme Court in *Bolden* and *Silva,* the rule of judicial administration that every judge shall hear all matters assigned, the preference by the Legislature in the Family Code for one judge

to hear a family law matter if possible, and the implications of due process as articulated in *European Beverage*, we conclude that while the appropriate standard of review in this case is abuse of discretion, it is abuse of discretion with elevated scrutiny.

## B. The Merits

### 1. *The Matter of Time*

The common law rules regarding mistrials were forged in the general context of protecting *parties* against irreparable prejudice, rather than protecting the *trial court's* own institutional interest in managing its time efficiently. The trial court's interest in efficient time management of its own time, at least as regards civil cases, is specifically covered by a rule of court (Cal. Rules of Court, rule 214(c)), which provides that *short cause* matters that exceed the allotted time are subject to the *discretionary* decision of the trial judge to declare a mistrial *or* complete the trial.

The mechanics of rule 214 go like this: First "short cause" matters are defined as five hours in terms of "the time estimated for trial by all parties or the court." (Cal. Rules of Court, rule 214(a).) Next, there is a provision to allow some cases to be considered a short cause and thus exempted from requirements of "case management review" that would otherwise attach. (Cal. Rules of Court, rule 214(b).) The final subdivision, subdivision (c), shows the teeth of the rule, giving the trial judge discretion to declare a mistrial if the five hour limit[8] is exceeded. The language of this final subdivision unambiguously makes the decision a matter of trial court discretion. ("If a short cause case is not completely tried within five hours, the judge may declare a mistrial or, in the judge's discretion, may complete the trial. In the event of a mistrial, the case will be treated as a long cause case and must promptly be set either for a new trial or for a case management conference.") In light of this provision, the Rutter Group family law practice guide advises litigants to prudently err on the side of overestimating time if there is any doubt, which may mean treating the case as a long cause matter when it might otherwise be short cause. (Hogoboom and King, Cal. Practice Guide: Family Law (The Rutter Group 2005) ¶ 13:24, p. 13-6 ["Underestimations of time can backfire! If a case is set for trial as a 'short cause' is not completed within short cause time limits . . .

---

[8] At least one county has a local rule in which short cause is defined as only three hours instead of the state rule which is five. (See Super. Ct. San Diego County, Local Rules, rule 5.7.1 ["Short cause trials may not exceed 3 hours including time for the judge to review the file, read the trial briefs, conduct chambers conferences and issue a ruling. Cases that exceed the 3-hour limit may result in a mistrial . . . ."].) We have no occasion here to resolve any issue regarding this inconsistency with the state rules.

the judge may declare a *mistrial* . . . . [¶] To avoid this scenario, prudence suggests the counsel err on the side of *overestimating time* whenever in doubt."].)

■ There is, however, no equivalent rule of court for *long cause* matters. The implication is—though surely within the bounds of reason and sound trial court administration—there are no *arbitrary* limits on trial time. We hasten to add, of course, that trial courts retain great power to prevent civil trials from taking more time than necessary (e.g., Evid. Code, § 352 ["The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time . . . ."]) and thereby wasting public resources on the back end (too much time) rather than the front (via a mistrial).[9]

However, some counties—conspicuously Orange County is *not* among them—have local rules that specifically provide for the problem of litigants in family law cases giving the trial court trial time estimates in *long cause* matters that are *too short*. The superior courts of San Diego, Santa Barbara, and Santa Clara all have local rules which provide for mistrials based on litigants exceeding their own time estimates.[10] However, this court is unaware of any local rule which puts maximum time limits on any given family

---

[9] Suppose, hypothetically, that, based on one party's overly conservative and pessimistic time estimate, a trial court were to allocate in a "long cause matter" an extraordinarily *large* amount of time for trial, and the other party, perhaps for some ulterior strategic reason, were to object and take a writ challenging in the appellate court such a generous allocation of time by the trial court. One, the standard of review would be abuse of discretion, and from the point of view of the litigation *between* the parties, it would be hard to imagine any abuse of discretion on the part of a trial judge in allocating *more* time rather than less. Neither party could credibly claim any prejudice. Whether the presiding judge of the relevant trial court might eventually "get on the case" of a judge who made this a habit (and whose trials were presumably run less than efficiently) would, of course, be another matter.

[10] See Superior Court of San Diego County, Local Rules, rule 5.1.6 ("Each Family Law case is calendared based on time estimates given. The Court must rely on the accuracy of the time estimates to properly manage the Court's calendar. Counsel and the parties should expect to be limited to the time estimate given. A failure to abide by the time estimate given may result in a mistrial being declared by the Court or an award of appropriate sanctions."); Superior Court of Santa Barbara, Local Rules, rule 1003 (applying to all civil matters; "Counsel are required to provide accurate estimates of the time required for hearing, when scheduling all matters for hearing on Court calendars. To the extent permitted by law and in the discretion of the judicial officer presiding any matter may be deemed submitted for decision on the evidence presented, ordered off calendar, or a mistrial declared, if time estimates are exceeded."); Superior Court of Santa Clara County, Local Rules, Family Rules, rule 5 ("Counsel and self-represented parties are to provide the court with reasonable and accurate time estimates for contested hearings. If the time estimate of either party is exceeded, the Court may, in its discretion, rule without further hearing, defer the matter to the end of the calendar if time permits, continue the matter to the next available date, declare a mistrial for the hearing or order the matter off calendar.").

law case, or, *independent* of time estimates provided by the parties them-selves, otherwise allows the trial judge to declare a mistrial if the trial judge determines that the case has exceeded some deadline imposed by the trial judge.

██ For our purposes here, the salient fact is that Judge Pollard did not mention anything about *the parties'* failure to adhere to any time estimate that *they* had previously given (assuming, for sake of argument, that that would even be a valid reason to declare a mistrial in Orange County where, in contrast with San Diego or Santa Barbara, there is no rule warning litigants of such a result). At the most there was only an oblique mention of the parties exceeding "allotted time," and the only referent for that "time" was the judge's own previously stated 3:00 p.m. Friday deadline. As this court observed in *Abbott v. Mandiola* (1999) 70 Cal.App.4th 676, 681, footnote 5 [82 Cal.Rptr.2d 808], "A trial, unlike grand master chess or the last two minutes of a close football game, should not become a race against the clock."

Of course, had the parties agreed on a one-week time estimate and it appeared they were going to take two weeks, the trial judge obviously would have been able to take some corrective action. Perhaps that corrective action might even include (along the lines of the San Diego, Santa Barbara and Santa Clara local rules) declaring a mistrial.[11] But this case involved less than even two days of trial testimony—the parties didn't even get a half of a half day that Friday afternoon—with only a few hours left to go.

The trial judge also expressed a general dissatisfaction with the amount of time the trial was taking in *relationship* to the amount at issue in the case, but that of course could not by itself justify a mistrial. Surely, we have no rule in California that the rich in their divorces get more time for justice than the poor in theirs. Moreover, the trial judge acknowledged that she had been liberal in allowing the parties to make objections, but that also could not justify a mistrial. That only showed an admirable willingness on her part to give each side its day in court. If one party had indeed been making frivolous objections for the sake of delay, *that* problem could have been handled on its own terms, and in any event it is unfair to penalize both litigants if the judge was too liberal in entertaining objections from one side. And finally, as we have stressed above, the record shows that actual trial time had taken less than two days, which on this record could hardly be held to be objectively excessive.

---

[11] Even so, we presume the trial court would weigh the relatively drastic consequences of chucking one week of court time down the drain against some lesser sanction. And, just to reiterate, we are obviously directing our comments to nonjury family law trials. While this opinion takes guidance from what the Supreme Court has said about mistrials in a criminal context, we do not see this opinion about a family law case as having any relevance for the conduct of criminal trials.

In sum, there is virtually nothing here involving the time *qua* time aspect of the decision to justify a mistrial.

### 2. *The Matter of the New Assignment*

The main reason which the trial judge gave for declaring a mistrial was her new assignment. Beginning the new year, she would handle a calendar in domestic violence. The implication of her comments on the record was that somehow her new assignment handling a domestic violence calendar would preclude her from hearing the last few hours of the Blumenthal divorce: "I'm not taking it to department L63 for my domestic violence calendar. I have no other choice. I have no other choice."

On the surface, the statement that the trial judge had "no other choice" but to jettison the case upon going to her new courtroom seems dubious. One could hardly imagine a set of circumstances more conducive to completing a particular trial in a new courtroom or new assignment: The judge was literally moving over one courtroom (from L64 to L63) in the same building.[12] Transporting the file would have been easy, and resuming the trial in the new courtroom would have posed no inconvenience to anybody.

Going beneath the surface, the trial judge's statement implies an assumption which is dubious, or at least not supported by the record, namely that somehow the exigencies of the new domestic violence calendar would have crowded out the completion of the Blumenthal's dissolution trial. But the judge did not make the case for any such assumption, and none appears from the record. There is no inherent reason that a judge, primarily assigned to hearing cases of alleged domestic abuse, cannot find a few extra hours to finish up a dissolution case in which she and the parties have already invested substantial time.

Undoubtedly one of the reasons the Legislature enacted Family Code section 2330.3 is that family law is one of those areas in which there is a particular need for continuity. (Cf. *Bidna v. Rosen* (1993) 19 Cal.App.4th 27, 38–39 [23 Cal.Rptr.2d 251] [emphasizing ability of single-judge assignments

---

[12] The "L" stands for "Lamoreaux," which is the building in the City of Orange separate from the regular Orange County Superior Courthouse in Santa Ana, which is almost exclusively devoted to cases of a domestic nature, including dissolutions, juvenile dependency, and domestic violence. We grant wife's request to take judicial notice of Judge Pollard's new January 2006 assignment as posted on the Orange County Superior Court Web site, which shows it as "family law." (We assume that "domestic violence" is a subdivision within that family law assignment.)

in family law to prevent abuse at its inception].) And in fact one of the factors which trial court presiding judges must use in making assignments is the need for continuity in a given area. (See Cal. Stds. Jud. Admin., Std. 6.603 (c)(1)(A)(v) ["the need for continuity in the assignment"].) Continuity assures that there will be one judge who is sufficiently aware of the personalities and interactions of the case to ride herd on the sometimes unfortunate tendency of family practitioners to become a little bit too personally embroiled in their clients' disputes. (Cf. Silberberg, *Family Law Lawyers First Must Respect Each Other*, L.A. Daily J. (Mar. 2, 2006) p. 8 ["In other areas of litigation, one sees nowhere near the number of motions for sanctions against counsel as one sees in family law cases. . . . In other areas of the law, it's rare to find a lawyer attacking his opponent personally for the manner in which he or she advocated the client's position—or referring to his opponent as untrustworthy or a liar. In family law courtrooms such tactics are common."]; accord, *Orange County Dept. of Child Support Servs. v. Superior Court* (2005) 129 Cal.App.4th 798 [28 Cal.Rptr.3d 877] [hearing officer in underlying case should have been the one to consider sanctions motion against party for having brought the proceeding in the first place]; *Abbott v. Mandiola, supra*, 70 Cal.App.4th 676 [judge in underlying case should have been the one to consider sanctions for mistrial prompted by change in one party's testimony].)

It would, of course, be impossible for any family law judge, nearing what for some may seem to be his or her manumission, to bring all the cases in their family law "inventory" with them to their next assignment. That really would—to follow through on the metaphor—be a kind of involuntary servitude, and, more importantly, the number of cases would no doubt interfere with the next assignment—any next assignment—if only because of the tendency of family law cases to remain open for extraordinarily long periods of time, and generate sometimes acrimonious litigation years after an ostensibly "final" judgment. (See *In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801, 808 [81 Cal.Rptr.2d 797] ["Unlike an auto accident case which might end with a tidy final judgment for money damages, the successive modifications possible in a family law proceeding can make the case resemble an unruly desert caravan strung out upon the sands."].)

But surely as to that limited number of family law cases in which the trial judge has already begun trial during his or her tenure on a family law panel, the trial administration and section 2330.3's interests in continuity strongly favor simply completing the case in the new assignment, and if it is really not "possible," the burden is on the trial judge to demonstrate why. After all, the trial judge is the person most knowledgeable about his or her own calendar and the nature of any forthcoming duties. In this case, as noted, the trial judge

made no effort to demonstrate why her new assignment would make it impossible to hear the final few hours of the Blumenthals' dissolution.

We need only add that the interest of access to justice for family law litigants in particular is implicated by any mistrial granted not because of prejudicial error, but for reasons of internal judicial administration. For people of limited means (as the Blumenthals would appear to be), it is particularly gratuitous to inflict the hardship of the additional attorney fees that must necessarily be incurred if a mistrial is granted because of some change of judicial assignment. The county isn't going to bear the cost of paying the Blumenthals' lawyers for two days of wasted trial—they are going to have to bear that burden themselves. To return to our earlier theme of a presumption against the waste of judicial and litigant resources, the fact is that for ordinary people the costs of hiring lawyers for even the less than two days of full-scale trial, as here, is onerous. A mistrial will impose a real "hit" on each party's remaining wealth. Some interest stronger than a perceived inability to easily accommodate completion of the trial in a new assignment must be present to justify that waste.

### C. Summary of Merits

The trial judge did not mention any excess by the parties of the time *they* had estimated for trial. Nor can less than two days of trial time be termed objectively excessive. The trial judge articulated no reason she could not complete the case in her new assignment, as against the recognized need for continuity in family law cases and a strong presumption that trials once begun by a judge should, if at all possible, be completed by that judge. The abuse of discretion in granting this mistrial is manifest.

### IV. DISPOSITION

This court invited an informal response from husband, and, as noted above, he *supports* the writ petition. As we have shown, this is a case where both parties will benefit by the granting of the petition. Given that trial was suspended in mid-November 2005, further passage of time will only tend to dull the memory of the case by the trial judge, which is one of the inefficiencies the writ petition seeks to prevent. A peremptory writ in the first instance is therefore appropriate. (*Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893].) Let therefore issue a peremptory writ commanding the superior court to require Judge

Nancy Pollard to complete the trial of the Blumenthals' dissolution in a reasonable time, regardless of her present assignment. The matter of costs in this writ proceeding is reserved for the trial court in the first instance.

Rylaarsdam, J., and Fybel, J., concurred.