Filed 2/27/23  Direct Action Everywhere SF Bay Area v. Diestel Turkey Ranch CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DIRECT ACTION EVERYWHERE SF BAY AREA,<br><br>Plaintiff, Cross-Defendant, and Appellant,<br><br>v.<br><br>DIESTEL TURKEY RANCH,<br><br>Defendant, Cross-Complainant, and Respondent. | A162017<br><br>(Alameda County Super. Ct. No. RG17847475) |

Appellant Direct Action Everywhere SF Bay Area (Direct Action) sued respondent Diestel Turkey Ranch (Diestel) alleging it violated California's False Advertising Law and Unfair Competition Law.  Diestel cross-complained against Direct Action (and three individuals connected with it), alleging trespass, conversion, and unlawful competition.  An eight-day court trial was held before an Alameda County Superior Court judge who, before he was able to prepare a statement of decision, left on indefinite medical leave.  The case was reassigned to another judge who offered the parties a choice:  a mistrial or having the new judge decide the case based on the transcripts, the evidence, and the trial briefs.  They chose the latter alternative and

1

stipulated to that. The second judge thereafter issued a comprehensive 29-page, single-spaced statement of decision finding in favor of Diestel on both the complaint and cross-complaint.

Direct Action appeals, making two arguments: (1) the second judge erred in concluding that Direct Action lacked standing as to its false advertising claims, and (2) the decision by the second judge violated its due process rights. We reject both contentions, and we affirm.

## BACKGROUND

### The Parties

Direct Action is an unincorporated association of animal activists, whose stated goal is to end all animal agriculture and meat consumption and the exploitation and killing of animals. It is actually the San Francisco chapter—the first and largest—of multiple chapters funded through Friends of Direct Action Everywhere, a 501(c)(3) nonprofit corporation. Direct Action has no bank accounts, no assets, and no paid staff. All of its expenditures are paid by Friends of Direct Action Everywhere or by direct in-kind donations from volunteers.

Diestel is a California corporation in the business of commercial turkey production.

### The Proceedings Below

On January 30, 2017, Direct Action filed a complaint against Diestel alleging two causes of action, styled as follows: "Violation of California Unfair Competition Law—Cal. Bus. & Prof. Code, § 17200, et seq." and "Violation of California False Advertising Law—Cal. Bus. & Prof. Code, § 17500, et seq."

Diestel filed a demurrer, which resulted in an amended complaint, which generated another demurrer, which the trial court sustained with

leave to amend.  This generated a second amended complaint that alleged five causes of action, styled as follows:  (1) Negligent Misrepresentation; (2) Breach of Express Warranty; (3) Violations of California's Consumers Legal Remedies Act (Civ. Code, §§ 1750–1785); (4) False Advertising (Bus. & Prof. Code, § 17500, et seq.); and (5) Violation of Unfair Competition Law (Bus. & Prof. Code, §§17200–17210).

Diestel demurred to the second amended complaint as well, and by order of February 5, 2018, the trial court sustained the demurrer to all five causes of action with leave to amend.  And with respect to the fourth cause of action, for false advertising, and the fifth, for violation of unfair competition law, the order said this:  "The Court determines that, for pleading purposes, [Direct Action] has adequately alleged standing to bring these claims. . . . Whether those allegations are true or not is an evidentiary issue that cannot be resolved in ruling on this Demurrer."  This ruling was made by the Honorable Ioana Petrou.

On May 21, Direct Action filed a third amended complaint (TAC), the operative complaint here.  In it Direct Action abandoned the first three causes of action it had earlier alleged, and maintained only two causes of action:  (1) for false advertising, in violation of False Advertising Law and Business and Professions Code section 17500, by falsely advertising its turkey products as "thoughtfully raised," "humanely raised on sustainable family farms," "range grown," and/or "slow grown"; and (2) for breach of Business and Professions Code section 17200, based on alleged fraud and unfair and unlawful conduct by such false advertising and by violating the criminal animal cruelty statutes at Penal Code sections 597, subdivision (b), 597.1, subdivision (a)(1), and former section 597f, subdivision (a).

On August 21, the trial court entered an order granting in part Diestel's motion to strike, striking Direct Action's requests for damages, i.e., its requests for an accounting, for punitive damages, and for pre-judgment interest. This left only injunctive relief and a request for attorney fees. This ruling too was made by Judge Petrou.

On September 27, Diestel filed its answer to the TAC.

Meanwhile, on December 8, 2017, Diestel filed a cross-complaint, naming as cross-defendants Direct Action and three individuals, Wayne Hsiung, Leslie Goldberg, and Michael Goldberg (when referred to collectively, cross-defendants.) The cross-complaint alleged claims for trespass, conversion, and unlawful competition. It also sought an injunction to prohibit the unlawful business practice of promoting trespass (a violation of Penal Code section 484) and conversion or burglary in open rescues from Diestel's farms and ranches (a violation of Penal Code section 484 and/or 459). The cross-complaint sought general damages, punitive damages, restitution, and attorney fees.

In September and November 2018, Direct Action made Code of Civil Procedure section 998 offers (998 offers) to Diestel on the cross-complaint.

On December 28, the case was reassigned to the Honorable Michael Markman. And on January 22, 2019, he entered a trial setting order bifurcating the complaint from the cross-complaint, and setting an October 2019 trial date for the complaint and a January 2020 trial date for the cross-complaint.

On October 11, a bench trial commenced before Judge Markman. It proceeded for eight trial days, ending on December 11, during which some 150 exhibits were introduced. As will be seen, despite the bifurcation order, the trial apparently included evidence relevant to Diestel's cross-complaint.

4

The parties filed written closing arguments, and on February 24, 2020, Judge Markman ordered the matter submitted.

At some point not apparent in the record, Judge Markman went on medical leave.

On March 16, the presiding judge of the Alameda Superior Court issued a notice of reassignment to the Honorable Julia Spain. According to Direct Action's opening brief, "[i]nquiries to the clerk revealed that Judge Markman was out on medical leave and that all of Judge Markman's cases had been reassigned."

On April 3, Judge Spain ordered that a case management statement be filed no later than June 10, which order stated that "Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of sanctions pursuant to [Code of Civil Procedure section] 177.5."

Then, on May 5, Judge Spain emailed the parties to inform them that it was probable that she would need to declare a mistrial unless the parties were able to stipulate to some other resolution. This is the email:

"Dear Counsel,

"I hope you and your families are all safe and well.

"On March 16, this case was reassigned to me because Judge Markman in on an extended medical leave of absence. From review of the file, it appears you had a [three to four] day court trial in December and the matter was taken under submission for issuance of a decision on February 24. Due to his illness, Judge Markman was unable to render his decision. It also appears that witnesses were called at the trial and briefs were submitted. Since I did not hear the trial nor have the opportunity to hear and observe the witnesses, it is probable I will have to declare a mistrial in this case. Before I do so in light of the time, effort and expense that has already gone

5

into this matter, I wanted to touch base with you to see if there were any stipulations you could agree upon which might obviate the need for a mistrial. For example, it appears the matter was recorded by a Certified Shorthand Reporter. Perhaps you could stipulate that I could read the record and all the briefs and render a decision based on that.

"Please confer and see if it is possible we can avoid having to retry this case. I would appreciate hearing back from you by the end of this week. Thank you.

"Best regards,

"Judge Julia Spain."

There is no indication in the record of any communications with Judge Spain after her email, no questions seeking any clarification of its content.

What is in the record is that eight days later, on May 13, counsel for all parties signed a "Stipulation Re Resubmission of Plaintiff's Unfair Competition and False Advertising Claims on Record" (the Stipulation). The Stipulation provides in its substantive entirety as follows:

"Defendants DIESTEL TURKEY RANCH ('Diestel') and Plaintiff DIRECT ACTION EVERYWHERE SF BAY AREA ('DxE' [Direct Action] or 'Plaintiff'), (collectively 'Parties'), through their respective counsel, hereby stipulate to the following:

"WHEREAS, plaintiff [Direct Action] filed its Third Amended Complaint ('TAC') against defendant Diestel on May 21, 2018, alleging claims for false and misleading advertising under California's Unfair Competition Law ('UCL'), Business and Professions Code section 17200, *et seq.*, and False Advertising Law ('FAL'), Business and Professions Code section 17500, *et seq.*;

6

"WHEREAS, Diestel moved to strike various allegations and claims for relief from the TAC on July 3, 2018;

"WHEREAS, by Order entered on August 21, 2018, the Court granted in part and denied in part Diestel's motion, striking specific allegations in [Direct Action's] requests for punitive damages and restitution from the TAC;

"WHEREAS, Diestel filed its Answer to the TAC, as modified by the Court's order, on September 27, 2018;

"WHEREAS, the Court held a bench trial on Plaintiff [Direct Action's] false advertising claims before Judge Michael Markman in Department 16 of the above-entitled court on October 11, 15, 16, 17, 21 and December 9, 10, 11;

"WHEREAS, Judge Markman took this bench trial matter under submission for issuance of a decision on February 24, 2020;

"WHEREAS, Judge Markman is on an extended medical leave of absence and is unable to render a decision;

"WHEREAS, this matter was reassigned to Judge Julia Spain on March 16, 2020; and,

"WHEREAS, the Parties have met and conferred and agreed that, in order to avoid the declaration of a mistrial, the written record of this matter, including the docket, Court's Orders, pre-trial filings, trial transcript, evidence admitted at trial and post-trial briefing shall be submitted to Judge Spain for issuance of a decision on Plaintiff's TAC.

"THEREFORE, the Parties stipulate that Judge Spain may, after review of the written record, including the pretrial briefs, complete trial transcripts, the evidence admitted by Judge Markman during the trial proceedings, post-trial briefs, and the docket in this action, issue a decision on Plaintiff's claims alleged in its TAC.

"IT IS SO STIPULATED."

The stipulation was signed by Gretchen Elsner and Sonya Mehta, two attorneys on behalf of two separate law firms for "Plaintiff and Cross-Defendants," and by J.T. Wells Blaxter, attorney for "Defendant Diestel Turkey Ranch."

On September 28, Judge Spain filed a 30-page, single-spaced Proposed Statement of Decision and Judgment, finding for Diestel on both the complaint and the cross-complaint. The last two pages of the proposed statement of decision addressed the "cross-complaint," and began with these two paragraphs:

"Diestel's cross[-]complaint alleges cross-defendants [Direct Action] and Wayne Hsiung committed multiple acts of trespass onto its property between September and October 2015 and converted or stole two turkeys, which also is alleged to have constituted trespass to personal property. At trial, plaintiff's activists and Hsiung admitted visiting defendant's property at least nine times, illegally entering its barns six times and stealing six turkeys as part of what they deemed an 'open rescue.' As described in the plaintiff's Organizers Handbook, investigators such as Hsiung in this case, admit their actions and publish their full identities as acts of civil disobedience. As the leaders of civil disobedience over the decades have demonstrated, no one who practices civil disobedience can presume to avoid the consequences.

"The facts of Diestel's cross-complaint being undisputed, accordingly the court finds in favor of cross-complainant Diestel Turkey Ranch and against cross-defendants Direct Action Everywhere SF Bay Area and Wayne Hsiung as to the allegations of trespass and conversion of two turkeys. *The court has found no record that the trial on the liability and damages of the cross-complaint was bifurcated and Diestel failed to present any evidence of damages at trial.* Accordingly, the court awards nominal damages of $1 per 6

8

occasions of trespass and $1 per converted turkey for a total of $8 awarded to cross-complainant and against cross-defendants jointly and severally. Likewise no evidence or argument was presented on Diestel's claim for punitive damages and the court has found no record that it was bifurcated. It appears to have been abandoned." (Italics added.)

The proposed statement of decision stated at the top of the first page: "NOTICE: . . . Within 15 days after services of the proposed Statement of Decision, any party may serve and file objections." And on October 13, objections were filed on behalf of "Plaintiff Direct Action Everywhere SF Bay Area." No objections were filed on behalf of any cross-defendant. Direct Action's objections were on one page, and were four in number, objecting: (1) to the "findings of fact and conclusions of law based on matters not presented to the trial court," including the "discussion of USDA residue data and . . . Penal Code [section] 597 . . ."; (2) to the "truncated findings of fact on Plaintiff's standing and requests that the standing testimony, which is undisputed, be included in the Court's findings on standing"; (3) to the conclusion that Direct Action does not have standing; and (4) to the language referencing the injunction against it on the cross-complaint, stating that "Cross-Defendants object to this Court's Proposed Statement of Decision and Judgment at page 30 referencing the injunction as to 'permanent' and 'encouraging others to remove any turkey from the possession of Diestel Turkey Ranch.' "[1]

As significant to an issue here, Direct Action did not respond to the italicized language in the proposed statement of decision, did not object that

---

[1] Direct Action's objections also pointed out that Judge Spain misstated its name as "Direct Action Everywhere" instead of "Direct Action Everywhere SF Bay Area." The statement of decision did change Direct Action's name as requested.

9

the decision on the cross-complaint was improper—in short, did not in any way object to the proposed statement of decision to the extent it disposed of the cross-complaint.

On November 23, Judge Spain filed her "Statement of Decision and Final Judgment." As noted, it was 29-pages long, single-spaced, finding for Diestel all the way, and will be discussed in some detail below. Suffice to say here that Judge Spain made two conclusions as to standing: (1) as to the false advertising claims, that Direct Action had no standing; and (2) as to the UCL claims, that Direct Action had standing, but failed in its proof.

Direct Action did not file a motion to set aside the judgment pursuant to Code of Civil Procedure sections 663 or 473, subdivision (d) or a motion for new trial pursuant to Code of Civil Procedure section 656 et seq.

On December 8, Diestel filed a memorandum of costs. That same day, Direct Action filed its own memorandum of costs, on the basis it was the prevailing party on the cross-complaint because its 998 offers exceeded the amount awarded to Diestel on the cross-complaint. Direct Action also filed a motion to strike or tax Diestel's memorandum of costs, which did not argue that the judgment on the cross-complaint was erroneous, but that it was the prevailing party on the cross-complaint. In short, at no point did Direct Action claim that Judge Spain' erred in deciding Diestel's cross-complaint— indeed, Direct Action sought affirmative relief based on that decision.

On January 21, 2021, Direct Action filed a notice of appeal.

In late April or early May 2021, Direct Action learned that Judge Markman had returned to the bench and was hearing cases. Direct Action moved this Court to remand that matter to Judge Markman for a decision on the evidence. We denied the motion on July 28.

10

## DISCUSSION

**The Conclusion That Direct Action Lacked Standing on the False Advertising Claims is Supported by the Record**

**Introduction**

Direct Action's first argument is that it "more than satisfied UCL and FAL standing requirements for Public Interest Organizations." The argument has five sub-parts, the first of which is the standard of review, which Direct Action claims is de novo, a claim that is wrong, as discussed below. The second sub-part is that "public interest organizations . . . can be UCL and FAL plaintiffs," a position with which Diestel does not disagree—indeed, as indicated above, a position with which Judge Spain agreed.

The third sub-argument, and the first of substance, is that "organizational plaintiffs satisfy UCL and FAL standing requirements by showing causation, not reliance." The argument is less than five pages long, and relies primarily on two cases: *Kwikset Corp. v. Supreme Court* (2011) 51 Cal.4th 310 (*Kwikset*) and *Animal League Defense Fund v. LT Napa Partners LLC* (2015) 234 Cal.App.4th 1270 (*LT Napa Partners*). We thus begin with discussion of the two cases.

*Kwikset* was a suit under the unfair competition and false advertising laws, brought by plaintiffs who challenged defendant's advertising of its locksets as "Made in U.S.A." The trial court overruled defendant's demurrer, concluding that plaintiffs had adequately alleged standing. The Court of Appeal issued a writ of mandate directing the trial court to sustain the demurrer and dismiss the action. The Supreme Court reversed the Court of Appeal, and remanded the case for further proceedings, with a lengthy explanation of why.

After discussing the UCL and California's false advertising law, the Court observed as follows:

"While the substantive reach of these statutes remains expansive, the electorate has materially curtailed the universe of those who may enforce their provisions. As we recently explained: 'In 2004, the electorate substantially revised the UCL's standing requirement; where once private suits could be brought by "any person acting for the interests of itself, its members or the general public"[citation], now private standing is limited to any "person who has suffered injury in fact and has lost money or property" as a result of unfair competition (§ 17204, as amended by Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004) § 3; see *Californians for Disability Rights v. Mervyn's, LLC* [(2006)] 39 Cal.4th [223,] 227– 228 . . .). The intent of this change was to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of " 'clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant . . . .' " (*Californians for Disability Rights*, at p. 228, quoting Prop. 64, § 1, subd. (b)(3).) . . . Proposition 64 made identical changes to the standing provision of the false advertising law; where once 'any person acting for the interests of itself, its members or the general public' [citation] could sue, now standing is limited to 'any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter' (§ 17535, as amended by Prop. 64, § 5). The question here is what these changes, and especially the requirement that a party have 'lost money or property,' actually mean." (*Kwikset*, *supra*, 51 Cal.4th at pp. 320–321.)

Then, after discussing "Injury in Fact," the Supreme Court turned to a discussion of " 'Lost Money or Property': Economic Injury," saying this:

"Proposition 64 requires that a plaintiff have 'lost money or property' to have standing to sue. The plain import of this is that a plaintiff now must demonstrate some form of economic injury. (*Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1591 [rejecting a claim where the plaintiff failed to allege ' "actual economic injury" ']; *Animal Legal Defense Fund v. Mendes* (2008) 160 Cal.App.4th 136, 147 ['This language discloses a clear requirement that injury must be economic, at least in part, for a plaintiff to have standing under' § 17204]; *Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 803 [permitting a claim to proceed where 'the allegations set forth a basis for a claim of actual economic injury . . .'].)" (*Kwikset, supra*, 51 Cal.4th at p. 323.)

And then the Supreme Court turned to the discussion that includes the language Direct Action relies on here—language, we hasten to add, it takes out of context. This is the discussion:

"C. '*As a Result of*': Causation or Reliance

"Proposition 64 requires that a plaintiff's economic injury come 'as a result of' the unfair competition or a violation of the false advertising law. ([Bus. & Prof. Code,] §§ 17204, 17535.) 'The phrase "as a result of" in its plain and ordinary sense means "caused by" and requires a showing of a causal connection or reliance on the alleged misrepresentation.' (*Hall v. Time Inc.* [(2008)] 158 Cal.App.4th [847,] 855; see also *Troyk v. Farmers Group, Inc.* [(2009)] 171 Cal.App.4th [1305,] 1349 ['the phrase "as a result of" connotes an element of *causation* (i.e., [plaintiff] lost money *because of* [defendants'] unfair competition)']; *Medina v. Safe-Guard Products, Internat., Inc.* (2008) 164 Cal.App.4th 105, 115 ['the "as a result" language imports a *reliance or causation* element into' [Bus. & Prof. Code,] § 17204].) This commonsense reading of the language mirrors how we have interpreted

13

the same language in other consumer protection statutes such as the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.). (See *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 641 [Civ. Code, § 1780, subd. (a), granting standing to consumers who have suffered damage 'as a result of' a violation, imposes a requirement that a violation must 'caus[e] or result[] in some sort of damage']; *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1292 ['as a result of' language in Civ. Code, § 1780, subd. (a) imposes a cause requirement].)

"This case, like *In re Tobacco II Cases*, 'is based on a fraud theory involving false advertising and misrepresentations to consumers.' (*In re Tobacco II Cases* [(2009)] 46 Cal.4th [298,] 325, fn. 17.) Our discussion there of the meaning of the 'as a result of' causation requirement is controlling here. Recognizing that 'reliance is the causal mechanism of fraud' (*In re Tobacco II Cases*, at p. 326), we held that a plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions' (*id.* at p. 306). Consequently, 'a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct . . . .' (*In re Tobacco II Cases*, at p. 326.)" (*Kwikset, supra,* 51 Cal.4th at pp. 326–327, fns. omitted.)

*LT Napa Partners*, a decision by our colleagues in Division Five, was not a false advertising case, but a case by plaintiff organization against operators of a restaurant (La Toque) for selling foie gras in violation of Health and Safety Code section 25982. The appeal followed the trial court's denial of defendant's anti-SLAPP motion to dismiss, a ruling the court affirmed. After discussing at length *Kwikset* (*LT Napa Partners, supra,*

234 Cal.App.4th at pp. 1278–1279), the court held that plaintiff had shown a probability of prevailing on the standing issue, pointing to a declaration from its executive director that showed it " 'diverted significant organizational resources to combat [defendants'] continuing illegal sales of foie gras,' " evidence that included " 'public outreach to remind the public of the July 1, 2012 effective date and reinforce the law's importance.' " And, the court added, following the effective date of the ban, "plaintiff paid a private investigator to visit La Toque, and '[u]pon learning the results of the investigations . . . , paid staff at ALDF [Animal Legal Defense Fund] diverted their attention from other ALDF projects to analyze the facts obtained during the investigation.' Subsequently, plaintiff 'expended significant staff time and resources to share its investigation findings with Napa law enforcement authorities.' Plaintiff's staff attorneys 'diverted time and attention from other projects and attempted to persuade the Napa authorities to enforce' the ban on sale of foie gras." The declaration also averred that the alleged violations of Health and Safety Code section 25982 " 'caused [plaintiff] to postpone projects that would reach new media markets, reach new people, better develop [plaintiff's] organization, and advance its mission.' " (*LT Napa Partners*, *supra*, 234 Cal.App.4th at p. 1280.)

Direct Action's argument as to standing is directed to its false advertising claims, as to which Judge Spain held that in order to establish standing under the FAL and the fraud prong of the UCL, Direct Action had to prove that it relied upon Diestel's alleged false advertising and suffered economic injury as a result. Judge Spain found that Direct Action produced no evidence that it or any of the volunteer activists acting on its behalf relied upon any alleged misrepresentations by Diestel. Indeed, she found that from the outset Direct Action's representatives "strongly suspected that the

15

defendant's advertising was false and were not deceived by it"; and, she held, "it is not actionable reliance under the law to intentionally divert resources or suffer economic harm in order to attempt to prove your pre-existing belief that advertising is false." Based on that, she dismissed with prejudice the false advertising claims under the FAL and the fraud prong of the UCL.[2]

That ruling is supported by the record. And the law.

**The Standard of Review**

As noted, Direct Action's argument begins with its assertion that the standard of review is de novo, for which proposition it cites *People for the Ethical Operation of Prosecutors etc. v. Spitzer* (2020) 53 Cal.App.5th 391, 398 (*Spitzer*) and *Cal. DUI Lawyers Ass'n v. Cal. Dep't of Motor Vehicles* (2018) 20 Cal.App.5th 1247 (*Cal. DUI*)). But *Spitzer* is a pleading case, following a demurrer sustained without leave to amend; and *Cal. DUI* is, as Direct Action itself distills it, a reversal after a summary judgment. Those cases have no application here.

---

[2] As noted, Judge Spain went on to conclude that Direct Action had standing to assert claims under the unlawful and unfair prong of the UCL based on its allegations that Diestel had violated Penal Code sections 597, subdivision (b), 597.1, subdivision (a)(1), and former section 597f, subdivision (a). However, she also concluded that Direct Action failed to prove (1) that Diestel committed unlawful animal cruelty under the Penal Code by failing to provide its turkeys with the basic necessities of food, water, shelter, or provide proper care and attention; or (2) that Diestel knew or should have known that it was failing to provide these necessities. As she put it, "The overwhelming weight of the evidence was to the opposite. . . . There was not one scintilla of evidence that the birds were deprived of adequate food or water. Quite to the contrary, the evidence established defendant provides the birds with ample food and probiotic water to help fatten them up for market. The unique construction of all of defendant's barns which provide open sides for fresh air and sunlight, curtains for shade and the GAP 3 barns which offer outdoor access more than satisfy the Penal Code's requirement for shelter."

The rule applicable here is that "[w]here the superior court makes underlying factual findings relevant to the question of standing, we defer to the superior court and review the findings for substantial evidence." (*San Luis Rey Racing, Inc. v. California Horse Racing Bd.* (2017) 15 Cal.App.5th 67, 73 (*San Luis Rey*).) So, when reviewing Judge Spain's determination, we "must 'view the evidence in the light most favorable to the judgment . . . and are bound by the trial court's findings that are supported by substantial evidence.'" (*San Diegans for Open Gov't v. Fonseca* (2021) 64 Cal.App.5th 426, 436, review denied (Aug. 25, 2021) (*Fonseca*).)

*San Luis Rey* and *Fonseca* were cited in Diestel's respondent's brief. Neither is even mentioned in Direct Action's reply. Instead, relying on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), Direct Action asserts we should not apply the substantial evidence standard to Judge Spain's factual findings because they were made on a written record. *Vivar* holds no such thing— indeed, just the opposite.

*Vivar* considered the appropriate standard of review for a motion to vacate a conviction under Penal Code section 1473.7. (*Vivar, supra,* 11 Cal.5th at pp. 523–528.) And as to it, our Supreme Court held that such motions should be given independent review, with deference given to a trial court's factual findings except in cases where the trial court's decision was made on a written record. (*Id.* at pp. 524–528.) This, the Court explained, was based on "multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is based, and the relative competence of trial courts and appellate courts to assess that evidence." (*Id.* at p. 527.)

All that said, *Vivar* concluded with this observation: "Our decision addresses only the independent standard of review under section 1473.7. Nothing we say here disturbs a familiar postulate: when reviewing a ruling under the substantial evidence standard, 'an appellate court should defer to the factual determinations made by the trial court,' regardless of 'whether the trial court's ruling[s are based] on oral testimony or declarations.' (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479; see *Haraguchi v. Superior Court* [(2008)] 43 Cal.4th [706,] 711, 713.)" (*Vivar*, *supra*, 11 Cal.5th at p. 528, fn. 7.)

**Direct Action Did Not Establish Standing**

Judge Spain held that Direct Action lacked standing to bring claims for false advertising under the FAL and UCL. That holding was right, for several reasons.

As *Kwikset* expressly held, since the passage of Proposition 64—which narrowed the standing requirements—plaintiff must allege actual reliance to have standing to pursue FAL claims and UCL claims predicated on fraud and misrepresentation. (Bus. & Prof. Code, §§ 17204, 17535 [limiting standing to plaintiffs that have "suffered an injury in fact and has lost money or property as a result of" the defendant's unfair competition or false and misleading advertising].) And the Court noted, the intent of the UCL and FAL's current standing requirements is " ' "to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of " 'clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with defendant. . . .' " ' " (*Kwikset*, *supra*, 51 Cal.4th at pp. 320–321 [internal citation omitted].)

*Kwikset* went on to confirm that "a plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate

18

*actual reliance*, on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions.' " (*Kwikset*, *supra*, 51 Cal.4th at pp. 326–327, quoting *In re Tobacco II Cases*, *supra*, 46 Cal.4th at p. 306 (emphasis added).) Even showing that a plaintiff suffered economic damages without establishing that they resulted from reliance on the alleged misrepresentations is not enough to establish standing. (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1363 ["when, as here, the predicate unlawfulness is misrepresentation and deception," plaintiff must plead reliance].)

Here, Judge Spain found that "[n]o evidence was produced at trial that plaintiff or any of its volunteer activists acting on plaintiff's behalf relied upon any alleged misrepresentations by defendant." Not only did substantial evidence support that finding, the actual evidence showed that Direct Action believed that Diestel's marketing was false before it ever began its investigation of it.

In its opening brief, Direct Action does not point to any evidence showing it actually relied upon Diestel's alleged misrepresentations. It also ignores *Tobacco II*, despite Judge Spain's—and *Kwikset's*—heavy reliance on it. Instead, Direct Action contends that through the consumer survey it presented at trial, it showed that consumers relied on Diestel's alleged fraudulent statements. However, a purported class of unidentified consumers are not the plaintiffs in this action. Direct Action is, and it must prove it or its agents actually relied upon Diestel's statements. It offered no such evidence.

Direct Action also asserts that Judge Spain conflated the lack of reliance by individuals involved with the organization itself. To the contrary, Judge Spain specifically found that there was no evidence that "plaintiff or

19

any of its volunteer activists acting on plaintiff's behalf" relied on Diestel's misrepresentations.

Direct Action also relies on the statement in *Kwikset* that the phrase "as a result of" means causation *or* reliance, and that it showed "causation." As to that, we have to ask, causation of what? A lawsuit? That has no merit?

Direct Action misconstrues *Kwikset* and takes that statement out of context. *Kwikset* did not establish a separate standing rule for organizational plaintiffs, or an alternative to alleging actual reliance on fraud based on false advertising and misrepresentation claims. To the contrary, the Court quoted language from *Hall v. Time, Inc.*, *supra*, 158 Cal.App.4th at p. 855, stating " '[t]he phrase "as a result of" in its plain and ordinary sense means "caused by" and requires a showing of a causal connection or reliance on the alleged misrepresentation.' " (*Kwikset*, *supra*, 51 Cal.4th at p. 326.)

Distilling our Supreme Court's lengthy discussion in *Kwikset*, the Reporter of Decision's Summary of the case puts it this way: "The court held that Prop. 64 should be read in light of its apparent purposes, i.e., to eliminate standing for those who have not engaged in any business dealings with would-be defendants and thereby strip such unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices. Accordingly, plaintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise, have lost money or property within the meaning of Prop. 64 and have standing to sue." (*Kwikset*, *supra*, 51 Cal.4th at p. 310.) That hardly describes Direct Action here.

In *Durell v. Sharp Healthcare*, *supra*, 183 Cal.App.4th 1350, plaintiff made a similar argument to the one Direct Action makes here, arguing that

20

reliance was an optional requirement given the use of the disjunctive "or," and that he satisfied the causation requirement by alleging that defendant's conduct caused him to incur unreasonable medical bills. (*Id.* at p. 1363.) The court rejected the argument, concluding that "the 'concept of reliance' unequivocally applies," and that *Tobacco II* controlled: "Construing the phrase 'as a result of' in Business and Professions Code section 17204 in light of Proposition 64's intention to limit private enforcement actions under the UCL, we conclude the reasoning of *Tobacco II* applies equally to the 'unlawful' prong of the UCL, when, as here, the predicate unlawfulness is misrepresentation and deception." (*Durell v. Sharp Healthcare*, *supra*, 183 Cal.App.4th at p. 1363.)

Relying on *LT Napa Partners, supra*, 234 Cal.App.4th 1270, Direct Action contends that as an advocacy organization it was not required to establish reliance, but simply had to show it suffered economic damages by diverting resources to challenge Diestel's alleged false representations. As noted, *LT Napa Partners* was not a false advertising case, but one where plaintiff alleged that defendant violated the UCL under the unlawful prong by violating a statute prohibiting the sale of foie gras. (*Id.* at pp. 1282–1283.) Reliance was not an issue.

Finally, Direct Action asserts that the court in *Patricia A. Murray Dental Corp v. Dentsply Int'l, Inc.* (2018) 19 Cal.App.5th 258 "indicated" that actual reliance is not an element of fraud under the UCL. That case was a class action in which the court affirmed the trial court's finding in favor of the defendant on all UCL counts on the merits. The court specifically stated "[w]e express no opinion on the standing analysis, as we have directly

21

proceeded to the merits." (*Id.*at p. 272, fn. 8.)  The court did not address the issue here.[3]

Direct Action argues that because Judge Spain found standing as to the unlawful and unfair claims, "[i]t logically flows" that Direct Action "had established standing for its false advertising causes of action."[4]  We do not

[3] Direct Action's argument also cites without discussion two other cases, neither of which has any applicability to the setting here:  *McGill v. Citibank* (2017) 2 Cal.5th 945, 955 and *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1146.

[4] Doing so, Judge Spain relied almost exclusively on *LT Napa Partners*, noting among other things as follows:  "Under the reasoning of . . . *LT Napa Partners* . . . plaintiff's unrebutted evidence at trial that it devoted a significant number of volunteer hours and donations of equipment in its investigation and effort to publicly expose what it contends is defendant's violation of the animal cruelty laws, the court is persuaded plaintiff has established its standing to pursue these claims under the UCL's unlawful and unfair prongs, for which '. . . it suffices to allege some specific, identifiable trifle of injury.'  ([] *LT Napa Partners*, *supra*, quoting *Kwikset* at p. 325.)"

While Judge Spain held as she did, finding UCL standing on the record here, many courts have held that organizations must point to separate aspects of their mission and specific programs that were put on hold as a result of the diversion caused by defendant's activity.  (*LT Napa Partners*, *supra*, 234 Cal.App.4th at p. 1282, (fn. omitted) ["plaintiff has presented evidence its investigatory expenditures, as well as the resources spent in attempting to persuade the authorities, had a purpose independent of the current litigation and might have rendered such litigation unnecessary"]; *Havens Realty Corp v. Coleman* (1982) 455 U.S. 363, 368 [finding standing because defendant's racial steering practice forced plaintiff organization to divert resources from providing counseling and referral services for low-income home seekers]; *NAACP v. City of Kyle* (5th Cir. 2010) 626 F.3d 233, 238–239 [organization could not allege standing based on diversion of resources when activities were part of organizations' "routine lobbying activities"]; *Int'l Acad. Of Oral Med. & Toxicology v. U.S. Food & Drug Admin.* (D.D.C. 2016) 195 F.Supp.3d 243, 258–259 [dental association had no standing to challenge proposed regulation because all efforts to challenge rule fell "neatly within the core set of activities it has long performed. . . .

understand how this "flows," logically or otherwise, as the claims, and the proof required, are not the same.

**The Prior Action—or Inaction**

Direct Action's fourth sub-argument is that "the trial court got it right during pleading and trial: Direct Action has standing." The argument is less than a page long, and begins with this: "Judges Petrou, Markman and Spain reached nearly the same conclusion that Direct Action had UCL standing," in essence arguing that some earlier action, or inaction, held that Direct Action had standing. Hardly.

As to Judge Petrou, Direct Action's argument is that her earlier order overruling Diestel's demurrer to the fourth and fifth causes of action in the TAC barred Judge Spain from finding after trial to the contrary. The argument is specious. As quoted above, Judge Petrou's order said that "The Court determines that, for pleading purposes, [Direct Action] has adequately alleged standing to bring these claims. . . . Whether those allegations are true or not is an evidentiary issue that cannot be resolved in ruling on this Demurrer."

It hardly needs citation of authority that a ruling on demurrer addresses only what its pled. And such a ruling hardly precludes Judge Spain's specific findings, based on the trial record, that "no evidence was produced at trial that plaintiff or any of its volunteer activists acting on plaintiff's behalf relied upon any alleged misrepresentations by defendant." Moreover, Judge Petrou also noted that the fifth cause of action was "based not only on alleged fraudulent conduct, but also on alleged unlawful conduct."

---

[Organization did not] modify its activities in any meaningful was from its standard programmatic efforts that existed before the Rule was promulgated"].)

23

In short, Judge Petrou's ruling on demurrer did not—indeed, could not—make any factual finding.

As to Judge Markman, the substance of Direct Action's fourth sub-argument does not refer to him. But in the "fact" section of its opening brief, Direct Action asserts that Judge Markman proceeded to trial without ruling on the standing issue raised in Diestel's brief, the claimed effect of which, Direct Action contends, is he "effectively rejected Diestel's contention that Direct Action did not have standing." And on the next page, Direct Action argues that in failing to raise this issue again at the pre-trial hearing, Diestel "accepted that Judge Markman had rejected its argument on standing." Judge Markman made no ruling "rejecting" anything. The pre-trial brief was not a motion for the court to rule on, but rather a discussion of the law and the anticipated evidence that would be presented at trial.

**Dismissal With Prejudice**

Direct Action's final sub-argument is that "Judge Spain erred by dismissing [the] false advertising claims with prejudice." This argument, too, is less than a page, and cites without discussion three cases: *Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 (*Lackner*), *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438 (*Common Cause*), and *Brown v. Superior Court* (2018) 19 Cal.App.5th 1208, 1216 (*Brown*) the second and third cases cited as "see also." Direct Action cites no case that holds that a dismissal of a claim after trial must be—indeed, even can be—without prejudice. Certainly the three cases it cites do not.

There is no discussion in *Lackner* of whether a dismissal for lack of jurisdiction based on the evidence presented at trial must be without prejudice. Instead, that case analyzed whether a dismissal on a statute of limitations ground, based on evidence presented at trial, can be the basis for

24

a malicious prosecution action. (*Lackner*, *supra*, 25 Cal.3d at pp. 749–750.) *Common Cause* was an action by a taxpayer and certain organizations against a county and several individuals seeking to have defendants deputize as registrars certain county employees. The issue was "taxpayer standing." (*Common Cause*, *supra*, 49 Cal.3d at p. 439.) And *Brown* simply recited the procedural posture of a related federal action when it stated that the district court had granted a motion to dismiss based on standing without prejudice and leave to amend. (*Brown*, *supra*, 19 Cal.App.5th at p. 1216.)

**There Was No Violation of Due Process Rights**

**Introduction**

Direct Action's other argument it that the decision by Judge Spain violated its due process rights. This argument has these four sub-parts: (1) Direct Action "has a due process right to have its case decided by the trial judge"; (2) "Judge Spain offered a false dilemma of mistrial or trial on the papers"; (3) "when conditions underlying the basis for a stipulation have changed, courts have the discretionary power to relieve a party of the stipulation"; and (4) "the trespass cross-complaint judgment entered without motion or trial must be vacated."

The first three sub-arguments fail for reasons both procedural and substantive. And the fourth fails because Direct Action waived its contention that Judge Spain's decision on Diestel's cross-complaint exceeded the scope of stipulation by failing to object on that basis—indeed, making a tactical decision to attempt to avail itself of that decision.

By way of brief background, Gretchen Elsner and Sonya Mehta, attorneys at two firms representing Direct Action, signed a written stipulation due to Judge Markman's "extended medical leave of absence," expressly agreeing that Judge Spain could decide the case. At no time below

25

did Direct Action to seek to have that stipulation set aside. It cannot have it set aside here: "Since appellants did not move to be relieved from the stipulation in the trial court, relief cannot be granted where first sought on appeal." (*Barendregt v. Downing* (1959) 175 Cal.App.2d 733, 736, and cases there collected (*Barendregt*).) The reason for the rule is that relief from a stipulation lies in the sound discretion of the trial court, and an appellate court will interfere only if appellant demonstrates an abuse of discretion. (*Lyons v. Lyons* (1961) 190 Cal.App.2d 788, 790.) Since Direct Action did not move below to be relieved from the stipulation, there is no trial court decision to review.[5]

In any event, the argument fails on the merits, beginning with the stipulation itself, which is about as clear and straightforward as a document can be. It cannot be gainsaid that a party that expressly agrees to an action in the course of legal proceedings cannot challenge that action on appeal. (See for example, *Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 779 [superintendent of education waived right to attack trial court's decision by expressly defending or agreeing to administrative and trial court action it subsequently objected to on appeal]; *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685–1686 [" 'appellant may waive his right to attack error by expressly or impliedly agreeing at trial to the ruling or procedure objected to on appeal.' [Citations.] There is nothing shocking

---

[5] Diestel relies on *Barendregt*, a case that Direct Action does not even mention in its reply brief. All it says is that Diestel's failure-to-act in the trial court argument "ignores the fact that Direct Action timely filed its appeals in January and April 2021, and therefore the Court of Appeal, not the trial court, had jurisdiction in late April or early May 2021 when Direct Action first learned of the facts that give rise to the request for relief." This does not address the issue.

about these rules. They are consistent with the adversary system's appreciation that lawyers in civil litigation must be given adequate breathing room to select whatever trial strategies they deem appropriate"].)

Direct Action's arguments are not to the contrary.

Direct Action's first sub-argument is that it has a due process right to have its case decided by the trial judge. After citing some inapplicable boilerplate, Direct Action relies primarily on three cases: *Swift v. Daniels* (1980) 103 Cal.App.3d 263 (*Swift*); *Armstrong v. Picquelle* (1984) 157 Cal.App.3d 122 (*Armstrong*); and *Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672 (*Blumenthal*). None is applicable.

*Swift* and *Armstrong* both interpreted Code of Civil Procedure section 635 (section 635), which addresses when a presiding judge may sign a formal judgment after a different judge presided over the trial.[6] Section 635 is not at issue here and Direct Action has not claimed that Judge Spain violated section 635. Nor could it, as Judge Spain did not simply sign a statement of decision based on a pronouncement of the trial judge, but rather reviewed the transcripts of the trial, the evidence, and the trial briefs, and filed her own statement of decision. Moreover, the parties in *Swift* and *Armstrong* did not stipulate that a new judge would issue a statement of decision.

*Blumenthal* involved a situation where the trial court allotted only two days for a trial in a marriage dissolution proceeding, which fell on the two days immediately preceding the judge's transfer to a domestic violence

---

[6] Section 635 provides: "In all cases where the decision of the court has been entered in its minutes, and when the judge who heard or tried the case is unavailable, the formal judgment or order conforming to the minutes may be signed by the presiding judge of the court or by a judge designated by the presiding judge."

calendar; and the judge declared a mistrial when the parties failed to present all their evidence within the two days. The wife filed a petition for writ of mandate, which the Court of Appeal granted, holding that the judge abused her discretion in declaring a mistrial merely because the parties did not complete the long-cause trial prior to an arbitrary deadline set by her, noting it was possible within the meaning of Family Code section 2330.3 for the trial judge to take the case with her to her subsequent courtroom assignment. (*Blumenthal*, *supra*, 137 Cal.App.4th at pp. 674–675.) This case does not involve a mistrial, and the standards for when a mistrial is appropriate do not apply here. Moreover, Judge Markman did not simply move to a different department, but was no longer presiding over any cases because he was on indefinite medical leave.

Direct Action's second sub-argument is that it was given a "false Hobson's choice," and that Judge Spain should have provided it with a third choice, to wait for Judge Markman to return to have him issue the opinion on the merits.

To begin with, we do not understand the situation to be a "Hobson's choice," as Direct Action was offered a choice between a mistrial or a decision by Judge Spain.[7] In any event, Direct Action cites to no case in which a stipulation was set aside on the basis that a party was given a "false Hobson's choice."

It is true that a stipulation may be set aside by a trial court when the facts stipulated to have changed, when there is fraud, mistake of fact, or other circumstances rendering it unjust to enforce the stipulation. (*Gonzales v. Pacific Greyhound Lines* (1950) 34 Cal.2d 749, 755.) None of

---

[7] A "Hobson's choice" is an apparently free choice when there is no real alternative. (Webster's 10th New Collegiate Dict. (2001) p. 550.)

that applies here. There is no intimation in the record of any fraud. Direct Action does not claim that Judge Spain induced it to execute the stipulation based on some mistake of fact. And Judge Spain did not make any misrepresentation regarding Direct Action's options.

Direct Action fails to cite to any evidence that its now proposed third alternative—to wait for Judge Markman to return to the bench—was available at the time the parties executed the stipulation, no evidence that in May 2020 anyone knew that Judge Markman would return to the bench at all, let alone within a reasonable time. Not only does Direct Action cite no authority that requires a court to permit parties to wait indefinitely for an ill trial judge to return, Judge Spain's offer of the two options comported with the court's inherent administrative powers to control litigation before it. (*Bauguess v. Paine* (1978) 22 Cal.3d 626, 635, fn. 5 [courts have broad and inherent power to control matters before them in order to ensure the orderly administration of justice]; see Code Civ. Proc. §§ 128, 187.)

Direct Action's third sub-argument is that the stipulation should be set aside because the "conditions underlying the basis [of the] stipulation have changed" since the parties executed the stipulation. The argument cites primarily to *In re Marriage of Jacobs* (1982) 128 Cal.App.3d 273, 283, fn. 3 (*Jacobs*), where the court said this: "It is within the discretion of the court to set aside a stipulation . . . where the facts stipulated have changed, or there has been a change in underlying conditions that could not have been anticipated, or where special circumstances exist rendering it unjust to enforce the stipulation."

Direct Action fails to point to a single changed fact since May 2020 when the parties executed the stipulation reciting that Judge Markman was on indefinite medical leave. Moreover, the fact he returned to the bench

29

approximately one year after the parties executed the stipulation supports that he was on extended medical leave.

Direct Action asserts that Judge Spain never gave it further detail regarding Judge Markman's medical condition. However, Direct Action neither claims it asked for such information nor demonstrates it was entitled to any such confidential information—not to mention, fails to show how any additional detail regarding Judge Markman's medical condition would have changed the recital in the stipulation that Judge Markman was on extended medical leave. In sum, in the language of *Jacobs*, there were no "special circumstances . . . rendering it unjust to enforce the stipulation."

Direct Action's final sub-argument is that the judgment against it on the cross-complaint must be reversed because Judge Spain's decision exceeds the scope of the stipulation. By way of brief background, the stipulation is titled "Stipulation Re Submission of Plaintiff's Unfair Competition and False Advertising Claims On Record," and refers to a trial "on Plaintiff's claims alleged in its TAC." Despite that, in her proposed statement of decision Judge Spain noted that she found "no record that the trial on the liability and damages of the cross-complaint was bifurcated"—language, as noted above, to which Direct Action did not object.

And in both her proposed statement of decision and final statement of decision, Judge Spain devoted the last two pages to deciding the cross-complaint. Doing so, Judge Spain observed that the facts were "undisputed," that Direct Action's activists admitted to visiting Diestel's property at least nine times, illegally entering its barns six times, and stealing six turkeys as part of what they termed an "open rescue." Based on those undisputed facts, Judge Spain found in favor of Diestel and against cross-defendants as to the claims of trespass and conversion.

30

The stipulation listed what Judge Spain was to decide and, as Direct Action puts it, "There is no mention of Diestel's cross-complaint. . . . Judge Spain's . . . decision . . . shortened that to the 'parties stipulated to Judge Spain ruling upon the case based upon the trial transcripts and the evidence previously admitted.' " And, Direct Action concludes, "[b]y not considering the docket, Judge Spain missed Judge Markman's unambiguous January 22, 2019, ruling stating the 'court will bifurcate the UCL claims and the cross-claims (trespass).' " Direct Action's description is accurate. And it shows the Judge Spain misread—or overlooked—the record.

That said, Direct Action had multiple opportunities to object to Judge Spain's decision. It did not. Not only that, Direct Action made a tactical decision to seek to obtain costs on the basis it was the prevailing party on the cross-complaint. In sum and in short, Direct Action waived any claim of error.

As the leading appellate commentary puts it, citing numerous cases, "**Waiver**: Appellants may be held to have *waived* a claim of error either by affirmative conduct or by failure to take proper steps in the trial court to avid or cure the error. [Citations.] [¶] '[F]airness is at the heart of a waiver claim. Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider . . . . *Bait and switch on appeal* not only *subjects the parties to avoidable expense*, but also *wreaks havoc on a judicial system* too burdened to retry cases on theories that could have been raised earlier.' [Citations.]" (Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group, 2021) ¶ 8:249, p. 8-187 (citations omitted).)

Or, as a later section puts it: "**Failure to assert error:** Appellants are commonly held to an 'implied waiver' where the error urged on appeal

31

was never asserted in the trial court. Appellate courts will not reverse for procedural defects or erroneous rulings that *could have been, but were not, challenged below*. [Citations.] [¶] . . . [¶] One court has complained, 'We recently have been deluged with . . . cases in which the appellant raises issues on appeal without having appeared or made a record in the trial court. At the risk of sounding like a broken record, we again cite the general [waiver] rule . . . .' (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.)" (Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶8:265, p. 8-190.)

*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247 involved an error in the polling of the jury, an error to which the party did not object prior to the jury being discharged. Speaking in the language of forfeiture, a companion to waiver, the Supreme Court held that error was forfeited by the failure to object, with this language: "The forfeiture rule generally applies in all civil and criminal proceedings. [Citations.] The rule is designed to advance efficiency and deter gamesmanship. As we explained in *People v. Simon* (2001) 25 Cal.4th 1082 (*Simon*): ' " ' " "The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." ' [Citation.] ' "No procedural principle is more familiar to this Court than that a *constitutional* right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." . . .' [Citation.] [¶] . . . 'The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate

32

them, and the result would be that few judgments would stand the test of an appeal.' " ' [Citation.]" (Fn. omitted; [citations].)' [Citation.]" (*Keener v. Jeld-Wen, supra,* 46 Cal.4th at pp. 264–265.)

In sum, a waiver will be implied if appellant failed to bring the error to the trial court's attention in an appropriate manner, e.g., by timely motion or objection. (*Doers v. Golden Gate Bridge, Highway & Transp. Dist.* (1979) 23 Cal.3d 180, 184–185.) In fact—and on point here—it has been held that the failure to bring errors in a statement of decision to the attention of the trial court waives the right to assert on appeal any error in it. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134.)

After Judge Spain decided the cross-complaint, Direct Action at no time informed Judge Spain it believed she had erred in making that decision. Direct Action had multiple opportunities to raise this issue, starting when it filed objections to the proposed statement of decision and judgment. And while it objected to the breadth of the permanent injunction issued in connection with the cross-complaint, nowhere did it object to the decision on the ground that Judge Spain could not decide it. Direct Action could have made a motion to set aside the judgment on the cross-complaint, pursuant to Code of Civil Procedure section 663, subdivision (1) [a judgment may, upon motion of the aggrieved party, be set aside and vacated based on "[i]ncorrect or erroneous legal basis for the decision, not consistent with or not supported by the facts; . . . ."] Or it could have filed a motion for new trial. It did nothing.

Moreover, it is evident from Direct Action's briefing on the costs issue that its decision not to object to Judge Spain's decision was a tactical choice, gambling that because Judge Spain awarded Diestel only nominal damages, Direct Action could recoup its fees and costs related to the cross-complaint

based on its 998 offers. Direct Action's argument on its motion to tax Diestel's costs is illustrative: "On November 16, 2018, pursuant to [Code of Civil Procedure section] 998, Direct Action offered $801 to Diestel, which was better than what Diestel obtained via the Court's judgment dated November 23, 2020. The Court awarded $8 to Diestel. Direct Action's November 2018 offer also addressed injunctive relief and offered that Cross-Defendants will not knowingly enter the Diestel properties of Jamestown Ranch and Sonora Ranch for three years after the acceptance of the settlement. After litigating the issues for several years, Diestel did not obtain a more favorable judgment from this Court. Because Direct Action made a [Code of Civil Procedure section] 998 offer to Diestel in writing, Diestel did not accept the offer, and Diestel did not obtain a judgment more favorable than the offer, Diestel is not entitled to its recover [*sic*] its postoffer costs and shall pay Direct Action's costs from the time of the offer. [Code of Civil Procedure section] 998[, subdivision] (c)(1); [citations.] Direct Action's reasonable offer, if accepted, would have ended the litigation that had nuisance value at best." Direct Action's gamble did not pay off.

Because Direct Action failed to bring the alleged error to Judge Spain's attention in any appropriate manner, it waived its claim that she exceeded the scope of the parties' stipulation.

**Some Words About the Amicus Briefs**

We granted two requests to file amicus briefs on behalf of Direct Action: one from Animal Equality, Humane Farming Association and Matthew Leibman (the Animal Equality Brief),[8] the other from Consumer Attorneys of

---

[8] Animal Equality describes itself as a registered 501(c)(3) nonprofit animal-protection organization that works to end the mistreatment of farmed animals, and since 2006 has worked to educate and inform the public about

California (the Attorney's Brief). And we offer a few observations about them.

Both briefs have arguments to the effect that Proposition 64 does not eliminate organizational standing. We do not understand the need for such arguments, as *LT Napa Partners* held exactly that—as did Judge Spain, who held that Direct Action had standing here, just not for the false advertising claims.

The table of contents in the Attorney's Brief lists an argument asserting that "causation, not reliance, is required for standing in direct organization and competitor cases under the UCL and FAL." The actual argument is that "respondent's myopic focus on reliance is misplaced in direct organizational and competitor standing cases." Whatever the argument, not one case is cited to support it.

A similar argument in the Animal Equality Brief asserts "actual reliance is not a condition for organizational standing." The argument that follows wanders far afield, and among other things asserts that "In the aftermath of *In re Tobacco II* Cases and *Kwikset*, courts have diverged on whether the actual reliance argument applies to business competitors or

---

inhumane farming practices, encourage governments to adopt laws that protect animals, and encourage companies to adopt more humane policies.

Humane Farming Association (HFA) describes itself as a registered 501(c)(3) nonprofit charitable organization that advocates for the protection of farmed animals. It was founded in 1985, has more than 270,000 members, and its projects and activities are designed to protect farm animals from cruelty and abuse, to protect the public from the misuse of antibiotics, hormones, and other chemicals used on factory farms, and to protect the environment from the impacts of industrialized animal factories.

Professor Matthew Liebman is an Associate Professor at the University of San Francisco School of Law.

organizations. [Citation.] While some courts have extended the actual reliance requirement to *any* UCL or FAL cases involving false advertising, regardless of theory, other courts have found reliance to be inapplicable where the injury is caused by false advertising but not predicated on deception or fraud. (See e.g., *Greenpeace, Inc. v. Walmart Inc.,* No. 21-cv-00754-MMC, 2021 U.S. Dist. LEXIS 178959, at *4-5 (N.D. Cal. Sep. 20, 2021) [requiring reliance where alleged injury was diversion of resources and frustration of mission caused by false statements]; *Allergan United States v. Imprimis Pharm., Inc.,* NO. SA CV 17-1551-DOC (JDEx), 2017 U.S. Dist. LEXIS 223117, at *35 (C.D. Cal. Nov 14, 2017 [finding reliance inappropriate where business competitor alleged loss of customers by defendants false advertising].)"

But whatever Animal Equality had in mind when it referenced "diverge[nce]," not one case cited holds "reliance is not a condition for *organizational* standing." (Emphasis added.) As best we can count, of the 45 plus cases cited in the briefs, three cases have found standing in false advertising cases without reliance, all of which involve competitors: *Allergan U.S. v. Imprimis Pharms., Inc., supra,* 2017 U.S. Dist. LEXIS 223117; *Lona's Lil Eats, LLC v. Door Dash, Inc.* (N.D. Cal. 2021) 2021 WL 151978; *Scilex Pharms., Inc. v. Sanofi-Aventis U.S. LLC* (N.D. Cal. 2021) 552 F.Supp.3d 901. In sum, neither amicus brief identifies one case that recognized an exception to the California Supreme Court authority requiring reliance in order for an organization to have standing for a false advertising claim. The cases cited involve competitors, not advocacy groups, and are clearly inapplicable to the setting here.

36

Finally we note that many other cases cited by amici either analyzed the economic injury element or involve organizational standing in non-advertising cases. They have no applicability here.

## DISPOSTION

The judgment is affirmed. Diestel shall recover its costs on appeal.

_____

Richman, J.

We concur:

_____

Stewart, P.J.

_____

Miller, J.

*Direct Action Everywhere SF Bay Area v. Diestel Turkey Ranch*
(A162017)