Filed 12/23/25  P. v. Machmuller CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ELI MACHMULLER,<br><br>        Defendant and Appellant. | A171972<br><br>(Lake County<br>Super. Ct. No. CR968660) |

Defendant Eli Machmuller was accused of sexually molesting three teenagers and charged with several crimes, including aggravated sexual assault on a child under age 14.  At trial, Machmuller testified that he was drugged before the primary incident, which involved 13-year-old D.W. and 13-year-old C.P., and could not remember what happened.  A jury then convicted him of some crimes as charged but only lesser included offenses of the most serious ones.  He was sentenced to nine years in prison.

On appeal, Machmuller claims that (1) his trial counsel rendered ineffective assistance by failing to object to hearsay statements in D.W.'s forensic interview;[1] (2) the prosecutor committed misconduct by suggesting Machmuller's counsel did not believe his drugging defense; (3) these two

---

[1] Machmuller has a pending petition for a writ of habeas corpus premised on both this and a second instance of alleged ineffective assistance of counsel.  (*In re Eli Machmuller* (A174946).)

errors were cumulatively prejudicial; and (4) the trial court erred by failing to instruct the jury on simple battery as a lesser included offense of sexual battery, the only count involving the third victim, 16-year-old W.B.

We reject these claims, except we agree that the jury should have been instructed on simple battery as a lesser included offense of sexual battery. Thus, we reverse the misdemeanor sexual-battery conviction and remand for the People to elect whether to retry that charge or accept a modification of the judgment to reflect a conviction of simple battery. In either case, Machmuller shall be fully resentenced. (See *People v. Navarro* (2007) 40 Cal.4th 668, 681.) Otherwise, we affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

In January 2023, then 48-year-old Machmuller lived in the Lakeport home of C.P.'s grandmother (grandmother). Grandmother testified that she invited him to move in a few months earlier after meeting him and learning he was unhoused. Machmuller had his own room and did not pay rent. C.P. often visited grandmother's house and was friends with D.W., who lived with her parents and brother next door. W.B., a family friend of grandmother's, also spent time at the house and was close with the other two girls.

A. *The Counts Involving D.W. and C.P.*

Around midday on January 15, 2023, C.P., D.W., and another friend, 13-year-old L.B., were hanging out together at grandmother's house. Grandmother and Machmuller were also there. According to D.W. and C.P., Machmuller went to the store and returned with a bottle of E&J brandy. All three girls went into his bedroom and began drinking shots of the brandy

2

chased with soda.[2]  D.W., who was about five feet tall and 100 pounds, testified that she and the other two girls each drank 15 to 20 shots of the liquor.  She testified that Machmuller, who is six feet, two inches tall, drank even more than that.  C.P., who was about five feet, six inches tall and 150 pounds, estimated that she herself drank 7 or 8 shots and D.W. had 10 or 11.  The girls, but not Machmuller, were also using marijuana C.P. provided.

While drinking in Machmuller's bedroom, the girls listened to music and danced.  At one point, D.W. pushed C.P. onto Machmuller's bed, and the two girls began "[w]restling around."  C.P. testified that Machmuller said "something along the lines of 'keep going.' "  After C.P. got up from the bed, Machmuller "reached over and grabbed [her] breast."  She testified that he had touched her breast on an earlier occasion and "said it was on accident, and [she] didn't like that.  That made [her] very uncomfortable."

At some point, C.P. and L.B. left the bedroom, and D.W. was alone with Machmuller.[3]  D.W. testified that Machmuller shut the bedroom door but did not lock it.  As they were both sitting on his bed, he began "talking about his children and how he ha[d]n't seen them in a long time, and he just liked [her] and C.P. reminding . . . him" of his own children.  Machmuller's speech was "slurred," and he sometimes said things D.W. could not understand.

D.W. was wearing a short top over a bra and a pair of boxers over a pair of underwear.  She testified that Machmuller "pulled at . . . the

---

[2] Grandmother testified that she saw Machmuller drink alcohol that day but did not realize the girls were drinking or in his bedroom until after the fact.  Grandmother had told him many times not to drink in her house, explaining, "[H]e was very rude when he was drunk.  He would grab at me, pull at me, just totally take advantage of me, scream in my face."

[3] C.P. indicated that all three girls left the bedroom together, but then D.W. returned there alone.  D.W., on the other hand, indicated that the two other girls exited the room together, leaving her with Machmuller.

3

waistband of [her] pants and was looking at [her] underwear, but he didn't say anything. He was just doing it." She moved his hands away and told him to stop, but "[h]e just kept pulling on" her boxers' waistband. Machmuller also "touched [her] breasts."

D.W. testified that Machmuller then "picked [her] up . . . with like full force[,] like restraining," and "scooted [her] around the bed." He removed her boxers and underwear. Holding her arms above her head "[e]nough to where it hurt," he began "licking [her] in [her] vagina." Machmuller then turned D.W. so she was facing away from him, "placed [her] on top of him, and . . . put his penis inside" her vagina. She did not notice him ever ejaculating.

D.W. testified that Machmuller's actions were unwanted and made her feel "[u]ncomfortable and gross." She did not "try to get away," explaining, "[N]ot because I didn't want to, just because I didn't know how to react. I felt frozen."

Eventually, Machmuller "just let go" of D.W., and she put her bottoms back on and left the bedroom. She found L.B. in grandmother's room and told the other girl that Machmuller "had touched [her] inappropriately and done things that [she] wasn't comfortable with." D.W. began crying, and C.P. and grandmother were told what had happened.

D.W. testified that grandmother then went to Machmuller's bedroom, gave Machmuller money she was keeping for him, and told him he needed to leave. C.P., who was extremely upset, picked up a baseball bat, went to Machmuller's room, and yelled at him to leave. C.P. testified that he was not responding, so she grabbed his arm and dragged him out of the room. At one point, he fell down, and she hit his shoulder with the bat. She then finished dragging him outside and "closed the door on him."

4

## B. The Investigation

After getting Machmuller out of the house, C.P. called the police. Around the same time, D.W. called W.B. and told her what Machmuller had done. Eventually, W.B. arrived at grandmother's house, after which D.W. returned to her own house and reported what happened to her parents.

Shortly before 5:00 p.m., within an hour after the call for service, a Lake County sheriff's deputy arrived on the scene. He first interviewed D.W. at her home, with her parents and brother present. After consulting with her mother, D.W. declined a sexual-assault exam or any medical treatment.

The deputy testified that it did not appear D.W. had been drinking, as she was talking normally and did not smell of alcohol. There was also no evidence that she had smoked marijuana. The deputy saw no indication that the other minors or grandmother had been drinking or smoking marijuana.

The deputy then spoke to Machmuller, who was sitting on the stairs to grandmother's house. Machmuller appeared to be "under the influence of alcohol," although he was conscious and able to communicate. Machmuller expressed concern about not getting grandmother in trouble but then told the deputy that he and the girls were "all dancing and having a very good time and eating."[4] When the deputy asked whether Machmuller touched D.W., he responded, "I took a nap." The deputy then asked whether Machmuller was ever alone with D.W., and Machmuller replied, "The, the truth is those young girls are very promiscuous." Finally, when asked directly what had happened, Machmuller responded, "I'm actually not too sure."

The deputy arrested Machmuller and transported him to jail. The deputy testified that Machmuller "was able to walk in freely unassisted and

---

[4] A body-worn camera recording of the deputy's interaction with Machmuller at the scene was admitted and played for the jury.

. . . was not sent for medical clearance by jail staff," as would be done if a person was more intoxicated. Booking photographs showed Machmuller in a "fairly disheveled" state, as the zipper of his pants was down, his belt was undone, and he was not wearing underwear. No blood test or any other means of measuring his intoxication was ever performed.

A forensic interview of D.W. was conducted on February 2, 2023, about two weeks after the incident.[5] During the interview, D.W. described many of the details to which she testified at trial, including Machmuller's pulling at her waistband to look at her underwear, orally copulating her while holding her hands down, and having sexual intercourse with her. She also described two acts that she did not mention at trial: a second instance of oral copulation after the intercourse, and digital penetration of her vagina after the first instance of oral copulation.

Law enforcement initially failed to collect the boxers and underwear D.W. was wearing during the incident. D.W. testified that after changing out of her clothes at home, she put them on the floor next to the washer and dryer. When contacted three days later, D.W.'s mother indicated the clothing was already washed. But five days after that, on January 23, 2023, D.W.'s mother informed the sheriff's department she found the clothing still in the dirty laundry. She put the boxers and underwear in a Ziploc bag, and a sergeant collected them the following day.

The "outside waistband of the boxer briefs, . . . the inside of the boxer briefs with special attention to the inside waistband, . . . the outside of the underwear, . . . [and] the inside of the underwear" were swabbed for DNA. Testing showed that Machmuller's DNA was on all four parts of the clothing

---

[5] A video recording of D.W.'s forensic interview was also admitted and played for the jury.

6

swabbed. The criminologist who performed the testing treated the case as one involving "touch DNA," and he could not say whether the DNA collected from the clothing came from "spit, semen, skin," or any other part of the body.

### C. The Count Involving W.B.

W.B. testified about an incident that occurred about two weeks before the incident involving D.W. and C.P. W.B. was doing dishes in the kitchen of grandmother's home. She testified that "just in passing," Machmuller did "some sly touching" of her by using his hands and his "side" to touch her buttocks. She told D.W. and C.P. about this touching at the time, but she did not report it to an adult until the later incident involving the other two girls.

W.B. testified that Machmuller had previously made her uncomfortable by making "comments on [her] appearance or the clothes [she] was wearing or [her] body." For example, on one occasion he stated that she was "showing a lot of skin in [her] pajamas." During the incident in grandmother's kitchen, however, Machmuller did not say anything to W.B.

### D. Machmuller's Testimony

Machmuller's testimony focused on the charges involving D.W. and C.P., and he did not address W.B.'s allegations. He indicated that C.P. was staying at grandmother's house that weekend. D.W. came over around 8:30 a.m. on the morning in question, and W.B. arrived later that morning. There was also at least one other girl present whom he could not recall clearly.

Machmuller testified that at some point, W.B. came into his bedroom and told him she and the other girls were having a birthday party. According to Machmuller, C.P. and D.W. were celebrating their 14th birthdays, and

W.B. was celebrating her 18th birthday.[6]  He remembered telling W.B. congratulations and observing that now she could vote.

Around 9:00 a.m., the girls ran out of the alcohol they had been drinking and asked Machmuller for some.  Contrary to D.W.'s and C.P.'s testimony, he testified that he had bought the bottle of E&J brandy the night before.  He claimed that "part of [his] agreement of living" at grandmother's house was that C.P. "gets whatever she wants," so he gave them his alcohol.

Machmuller testified that around 9:30 a.m., he "t[ook] a couple nips" of the alcohol himself.  Although he had been "busted for DUIs" and was in recovery, he usually drank some in the morning because of chronic knee pain.  He was "highly susceptible" to painkillers and antibiotics, which made him fall asleep, so he did not take pills.  The girls were aware of his drinking, which they referred to as "old-man aspirin."

Machmuller testified that the girls offered him a cup of orange juice mixed with the brandy.  As he was drinking it, he "was strongly encouraged to finish it because [the girls] wanted the cup back."  He also heard someone "whisper that it would help [his] knees."  This comment worried him, because it made him believe there might be drugs in his drink.  He testified that grandmother sold Oxycontin, among other drugs, and C.P. had access to it.[7]

---

[6] C.P. testified that she was born in May 2009.  D.W. testified that she was 13 years old at the time of the charged incidents and W.B. testified that she was "[16], turning 17," in January 2023, but D.W.'s and W.B.'s specific birth dates were not introduced.

[7] C.P. partially corroborated this claim, testifying that grandmother had a medicine cabinet in which she kept Oxycontin and that C.P. herself "used to have a problem with taking oxy."  C.P. also testified that D.W. knew about the medicine cabinet because grandmother took medications out of it in front of them.  Grandmother admitted keeping her "good medications" in a safe, but she denied any knowledge of C.P.'s having accessed them.

8

Machmuller testified that he put on music that would last about 20 minutes, the time it normally took for "whatever it is" he might take to "get in [his] system." Toward the end of the music, he began feeling "warm" and "weird." He was unable to focus properly, and around 12:00 or 1:00 p.m., he fell asleep. This was unusual, as he rarely took naps.

Machmuller testified that he woke up several hours later, around 4:30 or 5:00 p.m., feeling "groggy." C.P. "was shaking [him] and extremely happy," and she said, "They're here." Machmuller remembered her helping him with his clothes to "get ready to go outside," but he did not remember her threatening him with a baseball bat. He "[e]ver so slightly" recalled speaking to the sheriff's deputy, but he had no memory of being transported to jail. It took "several days" for him to feel normal, and he believed alcohol alone could not have caused his condition. As for his appearance in the jail photographs, he stated that he usually did not wear underwear but it was "not like" him to have his zipper down and belt undone.

When asked whether he touched C.P.'s breast, Machmuller did not deny it. Referring to her trial testimony, he said, "I think when [C.P.] was here yesterday, I think we both agreed that it was just merely an accident. It was more like, hey, how's it going? And believe it or not, a year ago she didn't have those. So you have to use your own judgment on that. I saw yesterday that she had developed[,] I guess would be the word that I'm trying to use there."

As for D.W., Machmuller denied touching her breast, said he was not "aware of" touching her vaginal area, and claimed "forc[ing her] onto the bed" would be out of character for him. Later in his testimony, Machmuller denied being attracted to D.W. or ever "inappropriately" touching her.

9

*E.    Procedural History*

Machmuller was charged with five felony counts involving D.W.:  three counts of aggravated sexual assault of a child under age 14 (based on oral copulation, digital penetration, and rape), false imprisonment, and lewd acts on a child under age 14 (groping).  He was also charged with one felony count of lewd acts on a child under age 14 (groping breast) as to C.P. and a misdemeanor count of sexual battery against W.B.[8]

The jury was instructed on various lesser included offenses for the three charges of aggravated sexual assault and on misdemeanor false imprisonment as a lesser included offense of the false-imprisonment charge.  After the jury indicated it was deadlocked on these counts, on the People's motion the trial court dismissed the aggravated-sexual-assault charges, the next lesser included offense of the oral-copulation charge, and the felony false-imprisonment charge, leaving the other lesser included offenses.  The jury then convicted Machmuller of oral copulation on a child under age 14, simple battery for the count originally involving digital penetration, unlawful sexual intercourse with a child under age 16, misdemeanor false imprisonment, both counts of lewd acts, and sexual battery.[9]

In October 2024, after denying Machmuller's motion for a new trial, the trial court sentenced him to a total term of nine years in prison, composed of

---

[8] The charges were brought under Penal Code sections 269, subdivision (a)(4) (oral copulation), (a)(5) (digital penetration), and (a)(1) (rape), 236 (false imprisonment), 288, subdivision (a) (lewd acts), and 243.4, subdivision (e) (sexual battery).  All further statutory references are to the Penal Code unless otherwise noted.

[9] The convictions were under sections 287, subdivision (c)(1) (oral copulation), 242 (simple battery), 261.5, subdivision (d) (unlawful sexual intercourse), 236 (misdemeanor false imprisonment), and, as originally charged, sections 288, subdivision (a) (lewd acts), and 243.4, subdivision (e) (sexual battery).

a term of six years for oral copulation and consecutive terms of one year for unlawful sexual intercourse and two years for the lewd acts against C.P. The court imposed a concurrent term of 180 days for the sexual battery of W.B., and it imposed and stayed terms of 180 days for simple battery, one year for false imprisonment, and six years for the lewd acts against D.W.[10]

II.
DISCUSSION

A.    *The Claim of Ineffective Assistance of Counsel Lacks Merit.*

Machmuller first contends that his trial counsel rendered ineffective assistance by failing to object to and seek redaction of three portions of D.W.'s forensic interview that he claims were hearsay. We are not persuaded.

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate "that counsel's performance was deficient," such that "counsel was not functioning as the 'counsel' [constitutionally] guaranteed," and "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Centeno* (2014) 60 Cal.4th 659, 674.) Thus, the defendant must show both that (1) "counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms" and (2) there is "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

---

[10] The abstract of judgment contains some errors that the trial court should ensure are not repeated upon resentencing. The abstract indicates the convictions for counts 1, 2, and 3 were under section 269 as originally charged and refers to count 1 as "Sexual Assault Child/Oral Cop" and count 2 as "Aggravated Sexual Assault/Minor." In fact, Machmuller was convicted in count 1 of oral copulation on a child under age 14 under 287, subdivision (c)(1); in count 2 of simple battery under section 242; and in count 3 of unlawful sexual intercourse under section 261.5, subdivision (d).

11

When evaluating a claim of ineffective assistance of counsel, we "defer[] to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*Mai, supra*, 57 Cal.4th at p. 1009.) "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai* at p. 1009.) Here, the third basis for finding ineffective assistance is the only potentially applicable one, as the issue of hearsay in D.W.'s forensic interview did not arise below.[11]

Machmuller claims his trial counsel should have objected to three parts of D.W.'s forensic interview as inadmissible hearsay. Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Such evidence is inadmissible unless it qualifies as an exception to the hearsay rule. (*Id.*, § 1200, subd. (b); *People v. Jasso* (2025) 17 Cal.5th 646, 668.) In the following discussion, which addresses each of the challenged statements in turn, we will assume without deciding that the trial court would have excluded each statement had counsel objected.

At the start of the interview, the interviewer said to D.W., "Promise that you'll tell me the truth?" D.W. responded, "Promise." Machmuller

---

[11] Ineffective assistance of counsel was one of the bases on which Machmuller moved for a new trial, but he challenged different aspects of his trial counsel's performance, and counsel did not provide a declaration or address her decisionmaking on the record.

claims there is no legitimate reason his trial counsel "would want the jury to hear that D.W. promised to tell the truth." But in our view, this response did little to bolster D.W.'s credibility. As the jury would have known from the balance of the interview, it was not conducted under penalty of perjury, and D.W. was old enough that it was virtually assured she would respond to the question as she did, whether she intended to lie or not. Moreover, as the Attorney General points out, D.W. swore an oath to tell the truth at trial, and her trial testimony was mostly consistent with her interview statements. Counsel would have had little to gain—except perhaps the trial court's ire— by seeking to exclude such an insignificant statement. As a result, we conclude both that counsel's failure to object to this statement could have been a reasonable tactical decision and that the statement's admission was patently harmless.

The second challenged statement occurred after the interviewer asked what D.W. liked to do for fun, and D.W., who was homeschooled, talked about recently staying at a friend's house for a couple weeks. D.W. stated that she went home but returned to the friend's house a few days later, explaining, "Because I'm bored, and I needed somebody to be with, and I was, like, having flashbacks to the whole situation [with Machmuller], so I was, like, crying before I came over there, and at first, [the friend's] mom didn't believe that happened, so, but I started crying, and I guess that made her realize that it actually happened 'cause my face was so, like,[¶] . . . [¶] sad and stuff."

Machmuller argues that this statement also bolstered D.W.'s credibility, by conveying that the friend's mother believed D.W. because of D.W.'s emotional response, and there was no reasonable basis for counsel not to object to its admission. He points out that during deliberations the jury asked to review this specific portion of the forensic interview, suggesting the

13

jurors found it significant. But we do not see how this statement could meaningfully affect the jury's assessment of D.W.'s credibility. Crucially, the statement did not detail what D.W. told her friend's mother had "happened," so it did not tend to suggest that any of D.W.'s particular allegations were worthy of belief. The information that D.W. was upset and crying in the days following the incident also did little to bolster her specific claims. Given the relative lack of significance of this statement, counsel could have reasonably decided not to object to it, and its admission was harmless.

Finally, Machmuller challenges the following statements D.W. made after the interviewer asked whether she "heard of [Machmuller] doing this to anybody else":

> "No, but he has—I mean, I think he might have, but I'm not sure if he fully like raped a girl, but I know that he's like beaten an ex-girlfriend. [H]e has touched my sister, not my actual sister, but my best friend, like touched her boob and her butt, and then like he's hit that grandma across the face and touched her butt and like stuff and like making her kiss him. . . . [¶] . . . [¶] And then he would . . . just like at random times . . . grab her face kinda and like pull in like super aggressively and . . . make her kiss him. And then, he touched the . . . best friend's mother . . . . So, he's like done weird stuff before . . . [¶] . . . [¶] . . . and never like touched anybody like not in there, I don't think."

Machmuller claims that his trial counsel could have had no rational tactical reason not to object to these statements, which "attack[ed]" his character and, in the case of the described acts against C.P., bolstered C.P.'s credibility.

We tend to agree with Machmuller that defense counsel should have sought to exclude these statements about prior bad acts. But ultimately, we need not determine whether counsel's failure to object fell below professional norms, because there is no reasonable likelihood Machmuller would have obtained a better result had the trial court excluded this evidence. The statements about the ex-girlfriend and grandmother suggested Machmuller

14

was physically violent, but the jury rejected the charges involving use of force and convicted him of lesser included offenses that did not have force as an element. The information that Machmuller "kissed" grandmother and "touched" C.P.'s mother was relatively innocuous, especially since it involved adult women. Finally, the statement about C.P. lacked detail, and it did not support the inference that D.W. personally witnessed such acts against her friend. Indeed, C.P. testified that she did not think anyone else saw Machmuller touch her during the charged incident, and the mere fact that she may have told D.W. about it did little to bolster C.P.'s credibility.

In short, we conclude there is no reasonable likelihood that the challenged statements individually or collectively affected the verdict. Thus, Machmuller's ineffective-assistance claim fails.

B.    *Reversal Based on Prosecutorial Misconduct Is Unwarranted.*

Machmuller next claims the trial court erred by denying a mistrial based on a comment about defense counsel the prosecutor made during closing argument. We are not persuaded.

1.    Additional facts

In her closing argument, Machmuller's trial counsel argued that the girls put Oxycontin in Machmuller's orange juice because they wanted him to dance with them, but it caused him to pass out. They then "stage[d] the situation" by undoing his pants and belt buckle because they were worried about getting in trouble.

On rebuttal, the prosecutor questioned whether this scenario was plausible. He said, "The orange juice roofy drink. If [defense counsel] had that information and she believed that information—." Defense counsel immediately objected, and the prosecutor did not complete his sentence. The trial court overruled the objection, but defense counsel continued, "He's

accusing me of lying." The court stated, "Counsel, you argue with me again, you're going to have troubles," and directed the prosecutor to proceed.[12]

The prosecutor continued, "Why weren't . . . C.P. and D.W. grilled about the orange juice, about the roofy? Why wasn't that the topic over and over and over? Why did we not hear about that until Mr. Machmuller took the stand? Because I'll tell you, I asked him. That was never told to law enforcement. . . . Why if that is the driving force of their defense that this person is involuntarily intoxicated because 13[-]year[-]olds wanted him to dance, why weren't they asked 50 questions about that? Was there orange juice in the house? When did you give him the orange juice? Didn't you want him to dance? Did you know his hips hurt? Would he not join you? I can think of 40 questions right now. But we didn't hear about it because it doesn't exist."

After closing arguments were done, the defense moved for a mistrial, claiming the prosecutor committed misconduct by "impl[ying] that [defense] counsel did not believe [Machmuller] during the trial" and "shift[ing] the burden of proof to the defendant." The trial court denied the motion. The court did not interpret the prosecutor's remarks "as calling [defense counsel] a liar" or shifting the burden of proof. Instead, the prosecutor merely correctly noted that "any attorney, if they have information they believe," can ask witnesses about it.

After denying the mistrial motion, the trial court gave defense counsel an opportunity to request a curative instruction. Counsel asked that the jury be instructed "that defense counsel has an absolute duty to not put on

---

12 When later discussing the issue outside the jury's presence, the trial court observed that defense counsel was "offended" when it overruled her objection: "I don't even think [counsel] realized, but she yelled back at me and glared at me saying, 'He's accusing me of lying.' "

witnesses that they believe . . . would lie to the Court." Although counsel was "not sure" if the instruction was "enough to cure the harm," she thought it was "a step in that direction." Questioning whether the proposed instruction truly addressed the issue, the prosecutor suggested that the court "reread the instruction that the defense has no burden to prove anything."

The trial court then reread to the jury CALCRIM No. 220, which discussed the prosecution's burden to prove guilt beyond a reasonable doubt. The court continued, "I would also point out that defense counsel has a duty not to put on witnesses that . . . counsel believe[s] would be lying or misleading the jury, okay? Just a basic principle of law."

           2.     Discussion

"Prosecutorial misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to . . . [deny] due process." [Citation.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 418.) " ' "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 284.)

We review the denial of Machmuller's mistrial motion for an abuse of discretion. (*People v. Ayala*, *supra*, 23 Cal.4th at p. 283.) "Such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*Ibid.*) "[T]he trial judge, present on the scene, is obviously the best judge of whether any error was so prejudicial to one of

the parties as to warrant scrapping proceedings up to that point." (*Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672, 678, italics omitted.)

A prosecutor may not "argue to the jury that defense counsel does not believe in [the defendant's] defense. [Citations.] Such argument directs the jury's attention to an irrelevant factor," because counsel's beliefs do "not help the jury determine whether, under the evidence presented, [the] defendant committed the charged crime." (*People v. Thompson* (1988) 45 Cal.3d 86, 112–113 & fn. 19.) On the other hand, it is proper to make " ' " 'comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.' " ' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1266.)

On appeal, Machmuller does not contest that it was "fair comment for the prosecution to point out that the minors were not questioned about drugging" him. Instead, he primarily takes issue with the prosecutor's initial comment about defense counsel's belief. Although Machmuller "agrees . . . that if an attorney believes information to be true, they may inquire about that information," he argues that here the prosecutor improperly "point[ed] to [defense counsel's] *disbelief* as the *reason* those inquiries were not made."

Had the prosecutor completed the challenged remark—"If [defense counsel] had that information and she believed that information"—by saying counsel would have questioned the girls about the drink, we agree that the statement could have been interpreted to mean that counsel did not ask such questions because she did not believe Machmuller was drugged. But counsel objected immediately, and the prosecutor never finished the thought. Instead, the rest of his comments focused on the defense's ability to ask questions, and he did not mention defense counsel's personal views again. In

18

the context of the closing arguments as a whole, the challenged remark was insignificant, and the trial court did not abuse its discretion by declining to grant a mistrial based upon it.

Even if the prosecutor's remark rose to the level of misconduct, we would conclude it was harmless. Machmuller concedes that "the prosecution's misconduct did not amount to constitutional error," meaning the relevant question is whether there is a reasonable probability that he would have obtained a more favorable result had the remark not been made. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) He argues that this standard is met because this was a close case turning on witness credibility, so the implication that defense counsel did not believe him was particularly damaging. But as we have said, the prosecutor never completed his statement about counsel's belief, instead turning to the questions counsel could have asked but did not. And the record shows that counsel reacted angrily to the prosecutor's unfinished comment, undercutting any perception that she did not, in fact, believe Machmuller's story.

Machmuller also claims the curative instruction about counsel's duty not to put on untruthful witnesses was ineffective because it "drew the jury's attention to defense counsel's irrelevant beliefs" instead of refocusing the jury on the evidence. In our view, however, the instruction further dispelled any possible prejudice from the prosecutor's comment. It did so because it tended to convey that counsel thought Machmuller, the primary defense witness, was credible since she offered his testimony.[13] Moreover, the trial court also

---

[13] Of course, a criminal defendant has the right to testify against defense counsel's advice, but the jury was not told that, and generally "the decision whether a defendant should testify is within the competence of the trial attorney." (*People v. Allen* (2008) 44 Cal.4th 843, 860.)

19

reread CALCRIM No. 220, which *did* refocus the jury on the evidence and the prosecution's burden of proof. Based on the record as a whole, it is not reasonably probable that the prosecutor's comment affected the verdicts.

C.	*There Was No Cumulative Error.*

According to Machmuller, the ineffective assistance of counsel and prosecutorial misconduct he identifies were cumulatively prejudicial even if not individually so. But the trial court did not err by denying a mistrial based on prosecutorial misconduct, and any deficiency in counsel's performance was harmless for the reasons given. Thus, there is no prejudice to accumulate. Finally, even if prosecutorial misconduct occurred, it was minimally prejudicial and would not justify reversal even if combined with any prejudice resulting from counsel's performance. Machmuller's claim of cumulative error fails.

D.	*The Sexual-battery Conviction Must Be Reversed Because the Jury Was Not Instructed on a Lesser Included Offense.*

Finally, Machmuller contends the trial court prejudicially erred by not instructing the jury sua sponte on simple battery as a lesser included offense of sexual battery. We agree that reversal is required.

"The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29.) Thus, even though Machmuller did not request an instruction on simple battery below, the claim is preserved for appeal. (See *id.* at p. 33, fn. 6.) We review de novo whether a trial court erred by not instructing on a lesser included offense, "considering the evidence in the light most favorable to the defendant" to determine whether substantial evidence supported the instruction. (*Id.* at p. 30.)

20

Machmuller was convicted of misdemeanor sexual battery against W.B. under section 243.4, subdivision (e)(1), which makes it a crime to "touch[] an intimate part of another person, if the touching is done against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." Simple battery is defined as "any willful and unlawful use of force or violence upon the person of another." (§ 242.) " ' "[T]he least touching" may constitute battery,' " and a touching is " 'unlawful' " if it is " 'harmful or offensive.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404.) On appeal, it is undisputed that simple battery is a lesser included offense of sexual battery. (See, e.g., *People v. Yonko* (1987) 196 Cal.App.3d 1005, 1010.)

Machmuller claims there was substantial evidence that his touching of W.B. was not for a sexual purpose, and thus that only simple battery occurred, because the touching happened in passing and he did not say anything during it. The Attorney General responds that since Machmuller "offered no defense to [this] count[, t]he jury was presented with only one version of the event—the prosecution's version, based on W.B.'s testimony that [Machmuller] touched her in a sexual manner." Thus, the Attorney General argues, "[t]here was no evidence presented from which the jurors could have reasonably concluded that [Machmuller] committed a simple battery when he touched W.B.'s buttocks with his hand and rubbed his body against her as she was washing dishes."

Machmuller has the better argument. Although he did not testify about the incident involving W.B., her testimony did not compel the conclusion that he touched her for a sexual purpose. W.B. testified that Machmuller "touched" her buttocks with his hand and side, not that he "rubbed" against her as the Attorney General claims. A reasonable juror

21

could have credited this testimony but nonetheless determined that Machmuller might have had a non-sexual purpose for doing so, such as moving W.B. so he could pass. Though Machmuller's past comments about W.B.'s body and appearance certainly permitted the inference that the touching at issue was sexual, he did not say anything at that time that conveyed such an intent. Viewing the evidence in the light most favorable to Machmuller, we conclude that there was substantial evidence on which a reasonable juror could have relied to determine that he committed simple battery only.

We thus turn to whether the error was prejudicial. Generally speaking, a trial court's "failure to instruct on [a] lesser included offense[] supported by substantial evidence [is] state law error" that requires reversal if "a different result was reasonably probable" under *Watson*. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196, 201; cf. *People v. Schuller* (2023) 15 Cal.5th 237, 260.) The prejudice stemming from such an error "is the risk that the jury ignored its instructions and convicted the defendant of an offense . . . for which the prosecution did not carry its burden. The jury might have been convinced that the defendant was guilty of some lesser included offense and, as a result, [been] tempted to convict of a greater offense rather than acquit." (*Gonzalez*, at p. 200.)

Applying this standard, we conclude the failure to instruct on simple battery was prejudicial. In resisting this conclusion, the Attorney General claims that "the evidence was overwhelming based on W.B.'s testimony that [Machmuller] touched her in a sexual manner," which was corroborated both by her immediate reporting of the incident to C.P. and D.W. and Machmuller's prior inappropriate statements. While there was no real question that W.B. *perceived* the touching as sexual, for the reasons given

above a reasonable juror could have nonetheless decided that the prosecution failed to prove that Machmuller intended it as such. In other words, a reasonable juror could have believed everything W.B. said but still harbored a reasonable doubt that Machmuller's purpose in touching her was sexual. Nor did the jury make any other findings establishing that it necessarily concluded Machmuller had such a purpose. (See *People v. Gonzalez*, *supra*, 5 Cal.5th at p. 200.) Particularly given that the jury was willing to convict Machmuller of lesser included offenses on other counts, we perceive nothing in the record dispelling the risk that because it was not instructed on simple battery, it convicted him of sexual battery rather than acquitting him.

## III.
### DISPOSITION

Machmuller's conviction for sexual battery is reversed, and his other convictions are affirmed. The matter is remanded for the People to elect whether to retry Machmuller for sexual battery. If they elect not to do so, the judgment shall be modified to reflect his conviction for simple battery in count 7. In either case, Machmuller will be entitled to a full resentencing.

                                          _____
                                          Humes, P. J.


WE CONCUR:


_____
Banke, J.


_____
Smiley, J.


*People v. Machmuller*  A171972